Rehearing refused by Division A, composed of Chief Justice PROVOSTY and Justices OVERTON and LECHE.

---

(92 South. 303)

No. 23414.

**C. A. ANDREWS COAL CO., Limited, v. BOARD OF DIRECTORS OF PUBLIC SCHOOLS, PARISH OF ORLEANS.**

(May 22, 1922. Rehearing Denied by Division B June 8, 1922.)

*(Syllabus by Editorial Staff.)*

1. Sales ⟨⟩71(4)—Under contract for all bituminous coal required, buyer could not discontinue use of anthracite and require additional bituminous coal at contract price.

Under a contract to deliver all the bituminous coal required by the schools of a city, of approximately 1,000 tons, with provision that the quantity to be purchased would be based upon the estimated annual consumption, reserving the right to order a greater or less quantity subject to actual requirements, the school board, by wholly discontinuing the use of anthracite and using bituminous coal exclusively, could not impose on the seller the duty of furnishing practically double the amount theretofore consumed and necessary under the conditions prevailing at the time of the contract.

2. Contracts ⟨⟩143—Construed as a whole and in the light of existing conditions and circumstances.

A contract must be construed as a whole and in the light of the conditions and circumstances existing at the time.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by the C. A. Andrews Coal Company, Limited, against the Board of Directors of the Public Schools, Parish of Orleans. From a judgment rejecting its demand, plaintiff appeals. Judgment set aside and judgment rendered for plaintiff.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellant.

Ivy G. Kittredge, City Atty., and Michel Provosty, Asst. City Atty., both of New Orleans, for appellee.

By Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.

THOMPSON, J. Plaintiff appeals from a judgment rejecting its demand, after a trial on the merits. The suit is for $2,299.50, balance claimed to be due on coal sold and delivered to the defendant for use in the public schools of the parish of Orleans for the scholastic term ending in June, 1917. The facts are undisputed. The validity of the contract is not controverted. It was a commutative contract, and one the parties had a right to make. The sole question presented is as to the extent of the respective obligations of the parties under the contract. In May, 1916, the defendant board published and distributed among the coal dealers spec-

ifications for the purchase of coal for use in the public schools for the fiscal year ending June 30, 1917, and invited sealed bids from the coal dealers. The estimated amount of coal to be purchased, it was stated, would be based on the estimated annual consumption; the right being reserved to the board "to order a greater or less quantity, subject to the actual requirements of the service." Separate bids were invited on anthracite and on bituminous coal, the approximate amount of the former being 500 tons and of the latter 1,000 tons. The plaintiff company offered the following bid:

"We propose to deliver best Brilliant Egg Lump coal to the city schools for the period of one year from date (June 1, 1916) for the sum of three dollars and seventy five cents per ton of 2,000 pounds, as per specifications on file."

This bid was accepted, and on June 20, 1916, a written contract was entered into between the plaintiff and the defendant. The relevant provisions of the contract are as follows:

"(1) The contractor will sell and deliver all the coal required by the public schools, of approximately 1,000 tons, for the fiscal year ending June 30, 1917, and the board of directors of the public schools will purchase and receive the same upon terms and conditions at the price hereinafter mentioned. (2) The quantity of coal to be purchased will be based upon the estimated annual consumption, but the right will be reserved to order a greater or less quantity, subject to actual requirements of the public schools."

At the time the bids were invited and the contract was entered into the public schools were equipped with heating apparatus for the use of both anthracite and bituminous coal, and both kinds of coal had been used in the schools for a number of years. Some time after the execution of the contract the school board abandoned the use of anthracite coal, eliminated the anthracite burners or appliances, and used bituminous coal exclusively. In the early fall of 1916 the price of bitu-minous coal began to advance, and in December of that year had gone to $6 a ton. The plaintiff, anticipating the fact that by the exclusive use of bituminous coal the approximated amount of 1,000 tons would be exhausted early in the month of January, wrote the defendant board on December 29th, 1916, as follows:

"Within the next day or two we shall complete the delivery of 1,000 tons of coal to the schools. This amount of 1,000 tons we realize was fixed in the contract as an approximation and we are perfectly willing to continue making deliveries under the contract until 1,200 tons of coal have been delivered to the schools. We are not willing, however, to make deliveries of coal under our contract in excess of 1,200 tons, and we trust that your board will realize that it is neither fair nor just under the circumstances to require deliveries under our contract in excess of 1,200 tons. At the time that our contract was entered into many of the schools were equipped with anthracite burners, and it had been the custom for years past to use both anthracite and bituminous coal in the public schools. Since the making of your contract the board of school directors has changed conditions by eliminating all anthracite burners from the schools and have since been using bituminous coal exclusively.

"Upon the completion of the delivery of 1,-200 tons under our contract, we shall thereafter bill the school board for all coal delivered at the rate of six dollars a ton."

To this letter the secretary of the school board replied as follows:

"I am directed to advise you that by action of the board had at its meeting, the board will adhere to the provisions of the contract entered into, * * * which said contract requires that you furnish and deliver all bituminous coal required for successful use in the school system until June 30, 1917, at the rate of $3.75 per ton."

Plaintiff continued to deliver coal until the end of the term, the aggregate amount being 2,222.87 tons, and billed the excess over 1,200 tons at $6 per ton. The defendant received the coal, and paid at the rate of $3.75 per ton, but refused to pay the advanced price. The suit is for the difference between $3.75 and $6 per ton on 1,022 tons.

It is alleged in the answer that the defendant did not contemplate using and did not contemplate binding itself, and did not bind itself, to use both anthracite and bituminous coal without the alternative of using either of said kinds of coal to the exclusion of the other, should the interests of the public schools require it. The argument of the learned counsel for the defense is that the school board had the right under the contract to discontinue the use of either kind of coal it deemed expedient, and to require the delivery of the additional amount made necessary under the changed conditions, at the contract price.

[1, 2] If the plaintiff's obligations were to be measured solely by the first paragraph we have quoted from the contract, "will sell and deliver all the coal required by the public schools of approximately 1,000 tons," there might perhaps be some force in counsel's contention. But the argument ignores altogether the second paragraph of the contract, "the quantity of coal to be purchased will be based upon the estimated average annual consumption * * * subject to actual requirements of the public schools," and fails to take into consideration the conditions as they existed at and prior to the time of the contract. The contract must be construed as a whole and interpreted in the light of the conditions and circumstances as existing at the time.

Article 2037, Civil Code, declares that every condition must be performed in the manner that it is probable that the parties wished and intended that it should be. And in Corpus Juris, vol. 13, page 525, it is said:

"In arriving at the intention of the parties where the language of a contract is susceptible of more than one construction, it should be construed in the light of the circumstances surrounding them at the time it is made, it being the duty of the court to place itself as nearly as may be in the same situation of the parties at the time, so as to view the circumstances as they viewed them, and so to judge the meaning of the words and the correct application of the language of the contract."

It is admitted that at the time bids were invited in the published specifications and at the time the contract was entered into, it was the intention of the school board to continue, as it had been doing for the past several years, the use of both kinds of coal. The average annual consumption of bituminous coal was from 1,000 to 1,200 tons and of anthracite from 500 to 600 tons. The evidence establishes that 500 tons of anthracite is equivalent to 1,000 tons of bituminous coal. The discontinuance of the use of the anthracite increased the requirement of the schools to around 2,000 or 2,200 tons of bituminous, approximately, if not practically, the quantity delivered by the plaintiff. If the board had continued the use of both kinds of coal in the proportion named in the specifications on which bids were invited and on which plaintiff's bid and contract was based, the plaintiff would not have been required to deliver more than 1,200 tons under its contract. That amount was the "average annual consumption" of bituminous coal, and would have sufficed to meet the "actual requirements of the schools."

The conditions just referred to must be regarded therefore as having been taken into consideration at the time of the contract, and that the plaintiff in making its bid and obligating itself to deliver "all the coal required by the public schools" did not contemplate, and had no reason to anticipate, that the school board would thereafter change the method of heating the schools, and that it (plaintiff) would be called upon under its contract to make delivery, by reason of the substitution of all bituminous for anthracite coal. We are not informed by the record of the necessity or the cause, which

actuated the school board in discontinuing the use of anthracite coal. If, as a matter of fact, the increased consumption had been due to weather conditions, or to the enlargement or expansion of school buildings, or to increased school attendance, then clearly the plaintiff would have been required to make deliveries to meet such conditions. The increment of coal would have come within the meaning of the term, "actual requirements of the public schools." But that is not the case. The increased requirement was not the result of any of the conditions named, nor due to any cause within the contemplation of the parties at the time of the contract, but was brought about by the action of the school board in discontinuing the use of the one kind of coal which plaintiff had not contracted to deliver and the substitution therefor, the other kind, thereby altering the contract and practically doubling the amount of that class of coal which had been theretofore consumed and necessary to the successful heating of the schools.

Our conclusion is that the school board was not at liberty to arbitrarily change the conditions prevailing at the time of the contract in the method of heating the public schools and to thereby impose upon the plaintiff the obligation of delivering the additional coal required on account of such changed conditions. The defendant therefore owes the plaintiff the market price of the additional coal delivered, less the amount paid thereon.

It is therefore ordered and decreed that the judgment appealed from be set aside, and that plaintiff have judgment against the defendant for the sum of $2,299.50, with 5 per cent. per annum interest from March 12, 1917. until paid, and with costs in both courts.

Rehearing refused by Division B, composed of Justices O'NIELL, LAND, and BAKER.