HUNT OIL COMPANY, Plaintiff,

v.

The OHIO OIL COMPANY, Defendant and Third-Party Plaintiff,

v.

A. J. HODGES INDUSTRIES, INC., et al., Third-Party Defendants;

The Pardee Company, Intervener.

Civ. A. No. 6506.

United States District Court
W. D. Louisiana,
Shreveport Division.

June 6, 1962.

J. Ralph Goff, Shreveport, La., for plaintiff.

C. Ford Currier, Blanchard, Goldstein, Walker & O'Quin, Shreveport, La., for defendant.

James D. Heldt, Dallas, Tex., W. Scott Wilkinson, Wilkinson, Lewis, Madison & Woods, Shreveport, La., for Bodcaw Co. (third-party defendant and counter-claimant).

David E. Smitherman, and Stuart D. Lunn, Smitherman, Smitherman, Purcell & Lunn, Shreveport, La., for A. J. Hodges Industries, Inc. and others.

Sumter P. Cousin, Shreveport, La., for M. H. Marr and others.

Dixon Carroll, Shreveport, La., for Magnolia Petroleum Co.

J. C. Smith, Shreveport, La., for F. H. Brown and P. G. LeGendre.

William H. Cook, Shreveport, La., Robert McL. Jeter, Jr., Tucker, Bronson & Martin, Shreveport, La., for William H. Cook, Fred Simon, Mrs. Louise Weiss Bronner, Mrs. Barbara Ann Weiss Simon, Mrs. Natalie H. Weiss.

James G. Cowles, Shreveport, La., for Mrs. Marie Amiss Smith, and Marilyn E. Watkins.

Robert Roberts, Jr., Blanchard, Goldstein, Walker & O'Quin, Shreveport, La., for intervener, Pardee Co.

BEN C. DAWKINS, Jr., Chief Judge.

This cause duly came on for trial on the pleadings and the Order for Separate Trial of Claims under Rule 42(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. entered by the Court herein on April 24, 1959, and the Court, having heard the evidence and considered the stipulation of the parties, and having considered carefully the extensive briefs and oral arguments, finds the facts and states its conclusions of law as follows:

### Findings of Fact

1. Plaintiff Hunt Oil Company is a corporation of the State of Delaware with its principal office at Dallas, Texas; Defendant The Ohio Oil Company is a corporation of the State of Ohio with its principal office at Findlay, Ohio; Nebo Oil Company, Inc. (now by change of

name Bodcaw Company), Third-Party Defendant and Counter-Claimant, is a corporation of the State of Delaware with its principal office in Dallas, Texas; A. J. Hodges Industries, Inc., Third-Party Defendant, is a corporation of the State of Louisiana with its principal office in the City of Shreveport, Louisiana, within the Western District of Louisiana, and in 1960 conveyed its properties in the Cotton Valley Field (hereinafter referred to) to General American Oil Company of Texas, a Delaware corporation with its principal office in Dallas, Texas, which by order of April 13, 1960, was made party to this action as a Third-Party Defendant; Socony Mobil Oil Company, Inc., Third-Party Defendant (successor to Magnolia Petroleum Company, a Texas corporation with its principal office in Dallas, Texas), is a corporation of the State of New York with its principal office in the City of New York; Midstates Oil Corporation, Third-Party Defendant, is a corporation of the State of Delaware with its principal office in Tulsa, Oklahoma; Third-Party Defendants M. H. Marr, R. A. Bristol, Marion Jean Bristol Wakefield, Mrs. Marie Amiss Smith and Marilyn E. Watkins are citizens and residents of the State of Texas; and Third-Party Defendants F. H. Brown, Mrs. Betty M. Harvin, the minors Elizabeth L. Gustine, Margaret M. Gustine, Marilyn M. Gustine and David D. Gustine, for all of whom Mrs. Betty M. Harvin is tutrix, P. G. LeGendre, Mrs. Tom Jones Moffitt, Mrs. Helen M. Ascher, Moses Ascher, Sam Sklar, William H. Cook, Fred Simon, Mrs. Louise Weiss Bronner, Mrs. Barbara Ann Weiss Simon, Mrs. Natalie H. Weiss and R. M. Wilson are citizens and residents of the State of Louisiana, residing within the Western District of Louisiana; Intervener The Pardee Company is a corporation of the State of New York with its principal office in Philadelphia, Pennsylvania. The amount claimed by Plaintiff of Defendant in this action is largely in excess of $10,000.

This action presents a controversy between Plaintiff and Counter-Claimant, both of which are citizens of Delaware and Texas, on the one hand, and Defendant, a citizen of Ohio, and Intervener, a citizen of New York and Pennsylvania, on the other; and ancillary thereto, a demand by Defendant against Third-Party Defendants for indemnity in the event it is cast in this action.

2. Plaintiff, Defendant, all Third-Party Defendants and Intervener have executed or ratified, and are parties to, the "Cotton Valley Unitization and Pressure Maintenance Agreement" (herein referred to as the "Agreement"), made part by reference of Plaintiff's complaint herein, which became effective June 29, 1940. A copy of the "Agreement" is attached hereto as an "Appendix A." Plaintiff, Defendant and all Third-Party Defendants are parties to the Agreement as "Operator" and Intervener is a party to the Agreement as "Royalty Owner"; see Definitions, "Agreement," p. 2, (Ex. 1 to Stipulation of Fact, attached hereto as "Appendix B").

3. (a) By the Agreement the parties thereto, including the parties to this action, unitized, pooled and communized (Article I), within a " 'D' Sand Participating Area" (Definitions, p. 2), and a "Bodcaw Sand Participating Area" (Definitions, p. 2), all oil, gas and other hydrocarbons separately as to each such Participating Area; and provided for the creation, within the Cotton Valley Field, under the circumstances therein described of "Other Participating Areas" (Article III and Definitions, p. 2);

(b) provided for the determination of the fractional part of the total production of oil, gas and other hydrocarbons from each Participating Area which was to be allocated to each party to the Agreement (Article II);

(c) made provision for the enlargement under the circumstances and limitations therein described, in the Cotton Valley Field, of the Bodcaw Sand Par-

ticipating Area and the "D" Sand Participating Area (Article IV);[1]

(d) made provision for the installation and operation of a recycling, pressure maintenance and liquid hydrocarbon extraction and processing plant for the return to the reservoir or recycling of some or all of the gas to be produced from the various Participating Areas, and for the sharing among Operators of the expense of oil and gas production operations in the Participating Areas, all of which operations were provided to be directed and supervised by an Operators' Committee upon which each Operator was represented; and

(e) made various stipulations in aid of and incidental to the provisions above summarized.

4. Plaintiff, Hunt Oil Company, and Third-Party Defendant and Cross-Complainant Bodcaw Company (formerly Nebo Oil Company) are owners, as Operator under the Agreement, of certain participating percentages in the "D" Sand Participating Area and the Bodcaw Sand Participating Area, by virtue of which they are entitled to certain percentages of the value of all oil, gas and other hydrocarbons produced from the "D" Sand Participating Area. By right of such ownership, they claim in this action from Defendant, The Ohio Oil Company, fractional parts of the value of oil and gas produced since February 1, 1957 by Defendant from two wells known as CVOC-Ohio-Hodges No. 2 Well in NW ¼ of NW ¼, Section 36, Township 22 North, Range 10 West, and the Ohio–W. T. Gleason Well No. 1–D in NW ¼ of SE ¼, Section 31, Township 22 North, Range 9 West, Webster Parish, Louisiana. The Court finds that the said Gleason and Hodges Wells are completed in, and that the Hodges Well (the Gleason Well having been converted into an injection well shortly after its completion) has produced oil and gas from, a separate pool or reservoir known as the North "D" Sand Pool which is located within the geographical confines of the Bodcaw Sand Participating Area and to the North of the "D" Sand Participating Area, such production being from a sand or formation known as the "D" Sand, which is found in the same stratigraphic interval as the "D" Sand of the "D" Sand Participating Area, but the pool or reservoir known as the North "D" Sand Pool being completely separated from the "D" Sand reservoir included in the "D" Sand Participating Area by an impermeable barrier or shale and siltstone over a mile wide; and that Defendant has, since February 1, 1957, produced oil and gas from the North "D" Sand Pool. The Court further finds that the Defendant and certain of the Third-Party Defendants have admitted that the North "D" Sand Pool has been considered by them to be within the definition of "Cotton Valley Field" as set forth in the Agreement (Definitions, p. 1).

5. The parties to the Agreement did not by the provisions thereof, and particularly by Article IV thereof, provide for enlargement of the "D" Sand Participating Area so as to include the whole or any part of an oil, gas or hydrocarbon pool or reservoir, in the stratigraphic interval of the Cotton Valley Field known as the "D" Sand, separate from and not connected with the pool or reservoir included in the "D" Sand Participating Area as originally established by the Agreement. No part of the North "D" Sand Pool, from which Defendant, by means of the Hodges Well referred to in Finding 4 has produced oil and gas since February 1, 1957, is a part of the "D" Sand Participating Area under the Agreement.

6. Finding 5 above, is based upon the Court's determination that:

(a) When the circumstances in the light of which the parties negotiated and

---

1. It is argued by Defendant that the enlargement provisions of the Agreement have been superseded by the Louisiana Commissioner of Conservation's Order No. 10–C, § 7 (*Exhibit 7 to Stipulation of Fact*); but the Court deems it unnecessary to pass on this argument.

executed the Agreement are considered, the meaning (Finding 5) of Article IV of the Agreement becomes clear. In 1939 and 1940, at the time the Agreement was drawn up and entered into, the parties by whom it was drafted and executed considered and believed that they possessed virtually complete scientific information concerning the nature, thickness, areal extent, total gas and oil reserves, reservoir characteristics and reservoir behavior of two hydrocarbon reservoirs then producing in the Cotton Valley Field, these reservoirs being the Bodcaw Sand Reservoir and the "D" Sand reservoir, in each of which both gas and oil wells had been completed and were then producing. This scientific information possessed by the parties was based on data from approximately one hundred wells which had been drilled to said two reservoirs, or to one or the other of them, said wells having been drilled at surface locations widely spread over the entirety of what was then considered the productive area of each reservoir, and was further derived from numerous analyses of cores taken from said wells, production tests run in said wells, electric logs of said wells, other characteristics of said wells, and also from the operation of a pilot plant which the parties, prior to entering into the Agreement, had constructed and operated for the purpose of determining with accuracy the feasibility, from the standpoints of both engineering and economics, of cycling said "D" Sand reservoir and maintaining pressure therein, and of cycling said Bodcaw Sand reservoir and maintaining pressure therein. Thus, at the time the contract was negotiated and executed, the parties thought they knew, within very close limitations, the areal extent of the "D" Sand reservoir and the Bodcaw Sand reservoir and they knew that each included additional acreage along the edge of each Participating Area as established by the Agreement, which was not included in the Participating Areas but on which were producing oil wells; and they thought that there might be additionally, minor extensions of the productive part of each of those reservoirs which might later be discovered by drilling. They knew that the owners of the oil wells around the edges of the two principal Participating Areas had a much more profitable operation than the owners of the gas wells on acreage included within those Participating Areas, and they knew that sooner or later, as production progressed, the oil wells would become gas wells (that is, would produce gas at a ratio of 10,000 cubic feet of gas or more per barrel of oil). They knew it was necessary to provide for control of the gas produced by these rim oil wells and by other wells subsequently drilled to the same reservoirs and for their integration into the Bodcaw Sand Participating Area and the "D" Sand Participating Area, respectively, when they should become gas wells. The known facts supported their belief that, with minor exceptions they considered immaterial, their contract was to operate upon one hydrocarbon reservoir in the "D" Sand and one reservoir in the Bodcaw Sand, both of which were considered to be known and substantially delimited, and upon deeper and then unknown or untested reservoirs (Restatement, "Contracts," §§ 230, 235, 236; Williston, "Contracts," Rev.Ed., Vol. 3, §§ 618, 619, 620; In re Tidewater Coal Exchange, 2 Cir., 292 F. 225; Adeline Sugar Factory Co. v. Evangeline Oil Co. (1908), 121 La. 961, 46 So. 935; Andrews Coal Co. v. School Board (1922), 151 La. 695, 92 So. 303; Mixon v. St. Paul Fire & Marine Ins. Co. (1920), 147 La. 302, 84 So. 790).

(b) The principal purposes of the parties in entering into the Agreement, as the Court finds from the provisions of the Agreement and from the circumstances in the view of the parties at the time it was negotiated and executed, were, to the degree practically attainable, to provide for unitization separately of the Bodcaw Sand Participating Area and of the "D" Sand Participating Area and to accomplish maintenance of pressures in the Bodcaw Sand and "D" Sand reservoirs included in the two Par-

ticipating Areas respectively. Unitization would be of economic benefit to the Operators by minimizing the drilling of unnecessary wells in such Participating Areas and pressure maintenance would be of economic benefit both to Operators and Royalty Owners by increasing the total hydrocarbons which would be produced during the life of the field from the Bodcaw Sand Participating Area and the "D" Sand Participating Area. The parties had knowledge, at the time the Agreement was negotiated and executed, that in a conventional production operation (that is, without pressure maintenance) pressures in each reservoir would decline as production proceeded and that when this decline in pressure reached, in each reservoir, a certain critical point some or all of the gaseous hydrocarbons in that particular reservoir would condense and adhere to the sand grains, thus losing mobility, so that they would never be produced. The pressure maintenance contemplated by the Agreement was to consist of bringing the gas from each reservoir to the surface, stripping it of readily condensible hydrocarbons by means of an extraction plant and pumping the stripped gas back into the reservoir (that is, "cycling" or as it is sometimes called "recycling"); by this operation pressure decline in the reservoir would be postponed and, additionally, the mixture of hydrocarbons in the reservoir, at the places occupied by the stripped gas, would contain less readily condensible materials. In a gas-bearing reservoir, pressure maintenance by means of cycling, from the physical nature of the operation, cannot be accomplished except separately with regard to one particular hydrocarbon pool or reservoir (see Restatement, Contracts, § 236 (b), p. 327).

(c) Provision is made by Article IV of the Agreement for enlargement of the "D" Sand Participating Area in the manner and under the circumstances therein described. After referring to wells producing outside the "D" Sand Participating Area to which the provi-sions of Article IV are otherwise applicable, that Article provides that:

"     *     *     *     Each such well, as to the particular sand from which it is producing and the production acreage allocated to such sand, shall without further formality come under the terms of this Agreement and the production therefrom shall be unitized, and said Production Unit, with an appropriate acreage factor hereinafter determined, shall be pooled and communized with the production and acreage in such participating area as of the first day of the calendar month succeeding the happening of the event,     *     *."

It thus appears that additional properties in the Cotton Valley Field to be added to a particular Participating Area must have a production Unit which the Agreement defines as

"that acreage, not to exceed eighty acres, within the Cotton Valley Field, but outside one of the Participatng Areas as defined herein, allocated by the Operator or included in his allocation to the Unit accepted by the Department of Conservation as the Unit for production of a well completed thereon outside such Participating Area but in the same producing formation."

The Agreement thus provides that the Participating Area can be enlarged only in "the same producing formation." The Court finds that the term "formation" as used by the Agreement in the definition of Production Unit means pool or reservoir (Carter Oil Co. v. McCasland (Ct. of App. 10, 1951), 190 F.2d 887.

(d) The Court finds from an examination of the Agreement as a whole that the parties did not contemplate the possibility of either the Bodcaw Sand Participating Area or the "D" Sand Participating Area under the Agreement including more than one hydrocarbon pool or reservoir, with the exception that one or more "C" Sand Reservoirs, which the parties knew could not be recycled and

which were considered to be of marginal importance, were lumped in with the "D" Sand Participating Area. The Court's determination in this respect takes into consideration (1) the provisions of Article IV for limited integration of certain acreage on which there were producing oil wells (in contrast to the gas wells in the Participating Areas) immediately surrounding the "D" Sand Participating Area and the Bodcaw Sand Participating Area, not included in the respective Participating Areas, and the provision for the delivery of the gas from such oil wells to the cycling plant for return "to the sand from which produced," obviously a provision for holding pressure upon the non-integrated oil wells in the same reservoir; (2) the provisions of Article XI, p. 14, "for the return to the reservoir or recycling of some or all of the gas which may be produced from the Participating Areas above mentioned," language which identifies "Participating Area" with "the reservoir"; and (3) the provisions of Article XI, p. 15, prescribing the maximum reservoir depth at which a well could be used for injection of gas (without the consent of a preponderant majority of the Operators), demonstrating the concern of the owners of the oil wells surrounding the Bodcaw and "D" Sand Participating Areas that gas should not be injected too close to their oil wells and establishing a regulation which would prevent, without additional agreement, the injection of gas into the North "D" Sand Pool, all of which is at a greater sub-sea depth than the established limitation. (O'Brien v. Miller, 168 U.S. 287, 18 S.Ct. 140, 42 L.Ed. 469.)

(e) In proceedings before the Commissioner of Conservation of the State of Louisiana, initiated by parties to the Agreement for the purpose of implementing the Agreement and making effective as to owners of rights in the Cotton Valley Field not party to the Agreement its provisions for unitization and pooling of the several Participating Areas established by the Agreement in the Cotton Valley Field, at a time substantially contemporaneous with execution of the Agreement, as well as in proceedings subsequent thereto, the parties and the Commissioner of Conservation, by his orders, construed the Agreement as providing for enlargement of the "D" Sand Participating Area and the Bodcaw Sand Participating Area to include only additional parts of the same reservoirs respectively.

(f) In 1943 the parties to the Agreement discovered that the opinion which they had held at the time of the execution of the Agreement in 1940 as to the areal extent of the Bodcaw Sand reservoir included in the Bodcaw Sand Participating Area under the Agreement was in error and that the Bodcaw Sand reservoir or pool of the Cotton Valley Field extended for a considerable distance to the north by reason of the fact that the underground structure containing the Bodcaw Sand reservoir declined and rose again on the north without interruption of the reservoir continuity by a decline below the level of the water contained in the reservoir. In negotiations and transactions consequent upon this discovery, the Agreement, and particularly Article IV thereof, was construed by the parties, including Plaintiff and other parties to this action, (see, for instance, Exhibit 15 to Stipulation of Fact) to provide for the enlargement of a particular Participating Area (in that instance the Bodcaw Sand Participating Area, the provision of the Agreement for the enlargement of which is the same as that for enlargement of the "D" Sand Participating Area) to include only lands containing pressure connected parts of the same hydrocarbon pool or reservoir as was included in the Participating Area under enlargement. This construction is binding upon the parties (LSA–Civil Code, Article 1956; Restatement, "Contracts," § 235(e), also Comment "h"; Smyth v. Board of Commissioners of Atchafalaya Basin Levee District (E.D.La.1949), 87 F.Supp. 138; Clement v. Dunn (1929), 168 La. 394, 122 So. 122; Davis Construction Co. v. Board

of Commissioners (1940), 207 La. 590, 21 So.2d 753.)

(g) On February 15, 1957, the "D" Sand Participating Area under the Agreement had been depleted to an extent in excess of 95% of the wet gas and recoverable hydrocarbon liquids, and the Bodcaw Sand Participating Area had been similarly depleted to the extent of almost 90%. Thus the interpretation of the Agreement proposed in this action by Plaintiff and Cross-Complainant is unreasonable and would accomplish an unreasonable and inequitable result (Restatement, "Contracts," § 236(a)).

■ (h) Plaintiff and Cross-Complainant have the burden of proof in this action which they have not discharged (Jones, Commentaries on the Law of Evidence (Second Ed.) Vol. 2, p. 859).

7. The parties to the Agreement did not by the provisions thereof provide for the creation of an Other Participating Area in the stratigraphic interval known as the "D" Sand. The North "D" Sand Pool from which Defendant by means of the Hodges Well referred to in Finding 4 has produced oil and gas is not an Other Participating Area under the Agreement.

8. Finding 7 above is based upon the Court's determination that:

(a) Plaintiff Hunt Oil Company by its pleadings and in its argument has never claimed that the North "D" Sand Pool is an Other Participating Area; and Cross-Complainant Bodcaw Company introduced the issue in a supplemental pleading and, upon the argument, discussed the matter first in a reply brief. The circumstances under which the issue has been presented to the Court indicate that it is an afterthought, which having been proposed, was thereupon abandoned. (State ex rel. Chehardy v. N. O. Parkway Commission (1949), 215 La. 779, 41 So.2d 678; Stilwell v. Hertz Drivuself Stations, Inc. (U.S.C.A. 3, 1948), 174 F.2d 714.)

(b) The language of Article III of the Agreement, which provides for the creation of Other Participating Areas coincidental in areal extent to the Bodcaw Sand Participating Area, in formations "other than the Bodcaw Sand and the 'D' Sand," treats the Bodcaw Sand and the "D" Sand identically as exceptions, it being obvious that the term "Bodcaw Sand" was used in Article III of the Agreement in the sense of a stratigraphic interval. It reasonably appears that the term " 'D' Sand" was used in the same sense in that Article.

(c) Under the provisions of Article VI(b) of the Agreement wells completed in the "D" Sand within the geographical confines of the Bodcaw Sand Participating Area but not within the "D" Sand Participating Area (as were the Gleason and Hodges Wells referred to in these findings) are free of all the terms of the Agreement, including the provisions of Article III thereof.

(d) The Agreement has been interpreted by the parties to the Agreement and to this action, through the Legal Committee of the Cotton Valley Operators Committee and to the knowledge of the parties, as not providing for the creation of an Other Participating Area to include the North "D" Sand Pool; Defendant has acted upon this interpretation by drilling, completing and operating the Hodges Well and Gleason Well herein referred to (Restatement, "Contracts," § 235(e), Comment "h"; Ullman & Company v. Levy (1930), 172 La. 79, 133 So. 369).

### Conclusions of Law

I. This Court has jurisdiction of this action and of the parties hereto. 28 U.S.C. § 1332.

II. The Court has considered carefully the objections made by Hunt Oil Company and Bodcaw Company to these Findings and Conclusions; and, on the whole record, we conclude that such objections are not meritorious and must be rejected.

■ III. Plaintiff Hunt Oil Company and Cross-Complainant Bodcaw Company (formerly Nebo Oil Company, Inc.) have by reason of their ownership

of interests in the Bodcaw Sand Participating Area and the "D" Sand Participating Area, or otherwise under the Agreement, no right or interest in oil and gas produced by Defendant The Ohio Oil Company from the North "D" Sand Pool by means of the CVOC-Ohio-Hodges No. 2 Well in NW¼ of NW¼, Section 36, Township 22 North, Range 10 West; and are entitled to take nothing of the Defendant by this action. A proper decree should be presented.