**CITY OF LAKELAND, FLORIDA, a municipal corporation, Plaintiff,**

**v.**

**UNION OIL COMPANY OF CALIFORNIA, a corporation authorized to do business in the State of Florida, Defendant.**

**Civ. No. 71-539.**

United States District Court,
M. D. Florida,
Tampa Division.
Jan. 10, 1973.

J. Hardin Peterson, Jr., of Peterson, Carr & Harris, P. A., Lakeland, Fla., for plaintiff.

John R. Lawson, Jr., of Holland & Knight, Tampa, Fla., for defendant.

## MEMORANDUM OPINION

HODGES, District Judge.

The City of Lakeland is a municipal corporation existing under the laws of the State of Florida. For many years, acting in a proprietary capacity, the City has owned and operated an electrical generation system for the distribution of electrical energy to its inhabitants and others in the surrounding geographic territory.

In 1968 the City had two generating facilities—the Larsen Memorial Power Plant, which was operating, and the Lake Mirror Plant, which was being held in reserve on a "cold standby" basis. The Larsen Plant included four steam turbine generators, the furnaces of which could be fired by burning as fuel either natural gas or Bunker "C" oil, or a mixture of both at the same time. Pursuant to a contract with the Florida Gas Transmission Company negotiated in 1960 for a ten year term, the City was using natural gas as the base or primary fuel at the Larsen Plant. Under that agreement the City was obliged to purchase certain minimum quantities of gas, but it also had the right to terminate the agreement in the event Bunker "C" oil became available at a more favorable price and the gas company refused to meet that price.

As a practical matter, since either fuel could be used interchangeably or even simultaneously, the principal distinction between natural gas and Bunker "C" oil, other than price, was and continues to be the difference in the methods of delivery. Bunker "C" oil is transported by common carrier and stored in on-site tanks, whereas natural gas is received on a continuous feed basis from the mains of the gas transmission company without on-site storage facilities. As a result, the supply of gas may be curtailed or suddenly interrupted due to difficulties in the transmission lines or increases in consumption by priority consumers, particularly during cold weather.

On May 24, 1968, the City prepared written specifications and solicited bids with respect to a contract for the purchase of Bunker "C" oil as a stand-by or alternate fuel. The Defendant, Union Oil Company of California, submitted the lowest of several bids. It offered a price of $2.31 per barrel. The parties then engaged in negotiations, however, resulting in a proposal by Union Oil to make deliveries at a maximum price of $2.28 per barrel.[1] This proposal was accepted by the City and a written contract was executed as of July 16, 1968. The bid specifications as earlier prepared by the City were incorporated into the agreement and comprised the essential terms of the contract which are now the focal point of this litigation. Those terms, in pertinent part, were as follows:

1—*General*

This specification covers the furnishing and delivery of Bunker "C" (No. 6) Fuel Oil to the Municipal Power Plants of the City of Lakeland, Florida.

2—*Period of Contract*

The period of contract shall be twelve (12) months and at the option of the City of Lakeland may be renewed yearly not to exceed five years. The City may use No. 6 Fuel Oil in any amount up to 100% of its fuel requirements if the Natural Gas supply is curtailed or interrupted by the Florida Gas Transmission Company. Should the equivalent price of No. 6

---

1. Specifically, Union offered to sell the oil (1) at the going market price, plus certain transportation and handling costs, or (2) at a price of $2.28 per barrel, whichever was lower. At that time the first alternative produced a delivered price of $2.16 per barrel.

oil as compared to the price of gas become lower than the price of natural gas the quantity of oil the City may elect to purchase may be approximately 18,000 bbls. per week increasing yearly as electric energy production increases.

### 3—Quantity

Approximately fifty-five thousand (55,000) barrels will be required for the initial fill of a new storage tank and some additional oil from time to time over the twelve month period.

Whereas natural gas is, at the present the base fuel at the Larsen Memorial Power Plant and whereas the Lake Mirror Plant is on a cold standby status, the use of No. 6 oil is presently regarded as a standby or alternate fuel to be used only when natural gas is unavailable and or Lake Mirror Plant is operated.

It is estimated that after the initial fill of the 55,000 barrel tank the oil requirements under this contract for the next twelve (12) months will be a minimum of fifty thousand (50,000) barrels.

It shall be the Buyer's option to increase the above requirements at any time and by any amount throughout the life of the contract in order to meet the 100% of the fuel requirements of the City's power plants.

During the year next succeeding the execution of this agreement, July 16, 1968, through July 15, 1969, the City ordered and Union Oil delivered approximately 234,000 barrels of Bunker "C" oil. During the same period the City also consumed natural gas in a volume equal to approximately 892,902 barrels of oil.[2] In terms of total fuel purchases, therefore, approximately 20% was oil and 80% was gas.

In the meantime, on May 27, 1969, the City notified Union Oil of its election to exercise the renewal option contained in the contract specifications so as to extend the agreement for an additional year from July 16, 1969, to July 16, 1970. This extension was acknowledged by Union Oil on June 4, 1969; and during the second year of the contract (July 16, 1969 through July 15, 1970) the City purchased and Union Oil delivered approximately 458,526 barrels of oil. The quantity of natural gas consumed during the same period was equivalent to 696,-848 barrels of oil—a ratio of approximately 60% gas to 40% oil. The City's purchase of oil thus increased substantially during the second year of the agreement, not only in terms of total barrels but also in proportion to the volume of gas consumed during the same period.

By letter dated June 2, 1970, the City again elected to extend the agreement for an additional year (July 16, 1970 through July 15, 1971), and Union Oil responded on June 5, 1970, acknowledging that extension.[3]

Thereafter, during the third contract year (July 16, 1970 through July 15, 1971), the City purchased approximately 736,348 barrels of oil and consumed natural gas equal to 582,063 barrels of oil; a ratio of approximately 56% oil to 44% gas.

---

2. One quantitative measure of natural gas may be expressed in "therms." A therm is a unit of heat equal to 100,000 B.T.U.'s, and the parties have stipulated that one barrel of Bunker "C" oil produces 63 therms. Thus, for comparative purposes, a given quantity of gas, expressed in therms, is divided by 63 in order to determine the equivalent quantity of oil expressed in barrels.

3. At that time the City was in the process of constructing a new power plant #3, and Union Oil's acknowledgment of the contract extension made explicit reference to the new plant. Union's letter stated, in part:

"Such advice (the City's election to extend) is appreciated for many reasons including the fact that we can and will schedule inbound tanker movements accordingly. By this we mean not only for the filling of the storage tank at Plant No. 3 but additional volumes as may be required, all pursuant to the contract."

Once again, therefore, it is obvious that the City substantially increased its consumption of oil in relation to the previous year, not only in terms of total volume, but in proportion to the consumption of natural gas as well. Indeed, oil had become the primary fuel, and the evidence suggests three reasons for these developments.

First, the City had commenced operating the new Plant No. 3, thereby increasing its generating and fuel consumption capacity. Secondly, the City had entered into a new interchange agreement with Tampa Electric Company (neighboring electrical utility) pursuant to which it sold more net electrical energy to that Company during 1970–1971 than it had in previous years.[4] These factors, coupled with the City's normal rate of growth, fully explain the increase in total fuel consumption (gas and oil combined). The emergence of oil as the City's principal fuel during the same period was apparently caused by a third, contemporaneous event.

On May 1, 1970, the City entered into a new agreement with the Florida Gas Transmission Company concerning the purchase of natural gas. Under that agreement the base price of gas was fixed at .033 cents per therm plus an escalation factor of .01587 cents per therm

for each one cent per barrel by which the monthly average *market* price of oil exceeded $2.34 per barrel.[5] The net effect of this pricing scheme made it economically advantageous for the City to purchase oil from Union at $2.28 per barrel whenever the *market* price of oil reached $2.48 per barrel.[6] And, it is apparent from the record that the market price of oil began increasing and reached that level in August or September, 1970, after which the City increased its purchases of oil in relation to its purchases of gas.

On June 7, 1971, in keeping with the same procedure followed in the past, the City notified Union by letter of its election to extend the contract for an additional year from July 16, 1971 to July 15, 1972. On this occasion Union replied, on July 8, 1971, that it would ". . . no longer be able to sell fuel oil to the City of Lakeland, Florida, after July 16, 1971, at a price of $2.28 per barrel or any other price other than a different price negotiated between the parties. We cannot accept your letter of June 7, 1971, as creating or extending any contractual relationship."

At all times subsequent to July 15, 1971, therefore, the City has purchased oil on the market (including some purchases from Union itself) at prices consistently exceeding $3.00 per barrel. It

---

4. The new interchange agreement with Tampa Electric Company was dated April 21, 1969. Prior to that time the arrangement between the two systems primarily involved a reciprocal exchange of power to meet emergency needs. Under the 1969 agreement, however, provision was made for exchange of energy in a variety of circumstances other than emergency conditions. Thus, during the period July 16, 1969 through July 15, 1970, the City sold approximately 4,886,000 net kilowatt hours of electricity to Tampa Electric Company. During the succeeding year (i. e., the third year of the contract between the City and Union Oil), the net energy sold to Tampa Electric Company increased to 32,137,500 kilowatt hours.

5. While these prices were the same as those specified in the 1960 gas agreement, the new contract did not contain those provisions of the earlier agreement permitting

the City to terminate in the event the gas company refused to meet a more favorable price of oil.

6. A base price of .033 cents per therm of gas is equivalent to a price of $2.079 per barrel of oil (.033 cents $\times$ 63 therms per barrel = $2.079). Thus, the difference between the base price of gas and the contract price of oil was .201 cents per barrel of oil ($2.28 − $2.079 = .201 cents). With an escalation factor of .01587 cents per therm, therefore, the price of gas would not become an equivalent of $2.28 per barrel of oil until the market price of oil exceeded $2.34 by approximately .1267 cents (.201 cents $\div$ .01587 cents = .1267 cents). Hence, even though oil was available to the City at $2.28 per barrel, gas remained the cheaper fuel until the *market* price of oil exceeded $2.47 per barrel ($2.34 + .1267 cents = $2.467).

then instituted this action in October 1971, alleging a breach of contract by Union for which the City seeks injunctive relief and a judgment for damages.[7]

## I

It is first contended by Union that the contract offends public policy and is void by reason of non-compliance with the simple and direct provision of the City's charter that "opportunity for competition shall be given" with respect to all purchases in an amount exceeding $500.00. Section 31, Chapter 59–1481, Laws of Florida. Union claims that this requirement was violated at the inception of the contract when the parties entered into private negotiations after the public bidding procedure had been concluded; and was subsequently violated again each time the City elected to extend the agreement for another year without re-bidding.

■■ It is axiomatic in Florida that a contract is absolutely void if made by public officers in derogation of a statutory duty to solicit competitive bids. The object of such legislation is to prevent favoritism or extravagance and to protect the public from collusive contracts. As a consequence, the statute should always be liberally construed to foster that purpose and avoid any likelihood of circumvention even in the absence of fraud or bad motive. E. G., Robert G. Lassiter & Co. v. Taylor, 99 Fla. 819, 128 So. 14 (1930); Wester v. Belote, 103 Fla. 976, 138 So. 721 (1931); City of Miami Beach v. Klinger, 179 So. 2d 864 (Fla.App.3d Dist. 1965).

■ In this instance, however, those salutary principles are clearly inapplicable. Indeed, it might even be said that the same principles and purposes, from the public's point of view, require that the contract be applauded and validated, not condemned, because it is plain by any measurement that the City got the best of the bargain. It is equally clear that proper procedures were followed. Detailed specifications were prepared and bids were solicited and received without irregularity of any kind. Union Oil was the low bidder, and in the process of awarding the contract the City was successful in negotiating a price even better than that contained in the bid. The post bid negotiations did not involve any departure from the original specifications, as occurred in both Robert G. Lassiter & Co. v. Taylor, and City of Miami Beach v. Klinger, supra; and neither is this a case in which the City undertook to negotiate with a high bidder to the exclusion and prejudice of a lower bidder, as occurred in Louchheim v. City of Philadelphia, 218 Pa. 100, 66 A. 1121 (1907), the principal decision upon which Union relies. The record is also devoid of any suggestion of fraud or favoritism, and while the lack of such elements will not save a contract made in clear violation of competitive bidding requirements, their absence at least creates a presumption of validity when (1) the contract has already been awarded and partially performed; (2) there was a bona fide effort to comply with the statutory bidding requirements; (3) it is not shown that the agreement is to public disadvantage; and (4) the challenge is made by the other party to the agreement as opposed to a taxpayer or, perhaps, another bidder who claims a denial of fair competition. See Wester v. Belote, supra, and Dillingham v. Mayor of City of Spartanburg, 75 S.C. 549, 56 S.E. 381 (1907).

■ Union's related contention that the contract, if initially valid, could not be extended absent re-bidding is equally unfounded. The City's election to extend did not create new and successive contracts. Rather, such elections merely operated to extend the duration of the agreement for specified periods under

7. The case was filed in state court and promptly removed here by Union Oil pursuant to 28 U.S.C.A. §§ 1441(a) and 1446 on the basis of diversity jurisdiction under 28 U.S.C.A. § 1332. No issue is made concerning the Courts' jurisdiction over the parties or the subject matter.

the same terms and conditions, all of which, including the option itself, had been the subject of the initial bidding procedure. Savage v. State, 75 Wash.2d 618, 453 P.2d 613 (1969); 64 Am.Jur. 2d, Public Works and Contracts, § 49 (1972). The option to extend, therefore, is in no different posture than the contract as a whole, and for the reasons already expressed, is not subject to challenge. The City fully complied with its duty to afford "opportunity for competition" under the terms of its charter.

## II

With greater vitality and more substance, Union also urges a variety of contentions which assail the contract as invalid upon the ground that the City's promise was illusory and that the agreement was not an enforceable "needs" or "requirements" contract.

These arguments are, first, that natural gas and Bunker "C" oil are the same general commodity—fuel—and the City has actually committed to nothing more than a hollow promise to purchase fuel from Union whenever it desires, while being equally free to purchase fuel from the natural gas company. Secondly, and by the same token, it is urged that the contract lacks the required degree of specificity since the City is not bound to purchase all or any ascertainable portion of its total fuel requirements from Union.

An instructive and leading authority concerning such agreements in Florida is Jenkins v. City Ice & Fuel Co., 118 Fla. 795, 160 So. 215, 218 (1935):

"Upon a research of the authorities we find that the adjudicated cases deal with contracts that naturally fall into the following classifications with reference to the proposition of mutuality of engagement as an element of the enforceability of agreements like that now under consideration:

"(1) Agreements by the buyer to buy and the seller to sell such quantity, if any, as the buyer may want, i. e., capriciously desire; the buyer being at liberty to buy elsewhere articles of the kind in question.

"(2) Agreements by the buyer to buy and the seller to sell all that the buyer may need or require in his established business.

"(3) Agreements of the buyer to buy and the seller to sell all that the buyer may want during the terms of the contract, i. e., capriciously desire; the buyer agreeing not to buy elsewhere during a given time any of the articles covered by the contract."

In the aggregate, Union's several arguments are clearly designed to compel the conclusion that its agreement with the City falls into the first classification or category of such contracts as described by the court in Jenkins; and if the agreement is so classified, Union must prevail since the Jenkins decision, and other authorities generally, would vitiate the contract as illusory or lacking in consideration and mutuality.

There can be no doubt, under the literal terms of the contract, and in the language of the Jenkins opinion, that the City is free to purchase as much or as little Bunker "C" oil as it may want from Union, i. e., "capriciously desire." Hence, the prime question is whether the City is also at liberty to purchase the same article or commodity from other suppliers as well. Union insists that it is, arguing that gas and oil are "apples and apples," that both are fuels subject to interchangeable or even simultaneous use. As a result, since the agreement also permits the City to purchase natural gas in any amount it desires, Union would conclude that the contract contains no promise at all sufficient to supply a valid consideration. Several decisions are cited in support of this position and are said to involve analogous facts, but all are clearly distinguishable. In C. A. Andrews Coal Co. v. Board of Directors of Public Schools, 151 La. 695, 92 So. 303 (1922), for example, the school authorities had traditionally used both anthracite and bituminous coal as fuel for heating their buildings. C. A.

Andrews Coal Co. contracted to deliver at a fixed price all of the bituminous coal that might be required during the next fiscal year, estimated to be approximately 1,000 tons. During the year the School Board abandoned the use of anthracite and began burning bituminous coal exclusively, with the result that it ordered more than twice the amount of bituminous coal originally estimated in its contract with C. A. Andrews Coal Co. The court held the contract to be valid, but also determined that the coal company was not obliged to sell any bituminous coal at the contract price beyond the tonnage that would have been required if the school board had not converted to the exclusive use of that product. It is readily apparent, therefore, that this decision is of little aid to Union, first because the agreement was held to be valid, not invalid, and secondly because the agreement between the City and Union in this instance expressly contemplated the possibility of a conversion from gas to oil as the primary fuel.[8]

▇ Furthermore, while it is quite true that both natural gas and Bunker "C" oil are fuels susceptible of interchangeable use, it does not follow that they are "apples and apples" as contended by Union. Their physical properties are entirely distinct so that the means of delivery and storage are likewise different, a factor of utmost importance in this case. This and other considerations also produce critical differences in availability and price. Natural gas and Bunker "C" oil are not the same commodity.

▇ The fact that the City was free to purchase natural gas elsewhere did not render meaningless its agreement to purchase oil from Union. Rather, the question becomes whether or not the City was bound to purchase its *oil* from Union alone, and a fair reading of the

entire agreement requires the conclusion that the City was so committed at least to that extent. While the contract does not in specific terms preclude purchases of oil from other suppliers, that was its clear intent and legal effect. As already noted, the agreement was born out of competitive bidding procedures, specified a definite term, and began with the phrase that "Seller agrees to sell and *Buyer agrees to purchase from Seller,* upon the terms and conditions herein expressed . . ." (emphasis supplied). If the City elected to purchase any oil at all, it was plainly bound to make such purchases only from Union during the life of the contract.

Thus, reverting to the three categories or classifications of such agreements as described in *Jenkins,* supra, the contract in this case is plainly within category three; that is, an agreement of the buyer to buy and the seller to sell all that the buyer may want during the term of the contract, i. e., capriciously desire; the buyer agreeing not to buy elsewhere during a given time any of the articles covered by the contract. As so classified, Union would still dispute the validity of the contract due to the lack of specific or ascertainable standards by which to measure or reliably estimate the quantity of oil that might be ordered; and, to be sure, some authority can be marshaled in support of that position. In *Jenkins,* however, the court squarely held that agreements of this description are supported by sufficient consideration and are enforceable at law (160 So., at 218–219):

"(2) We hold, therefore, that an agreement in writing under seal, such as that involved in the case now before us, whereby the buyer has agreed to buy, and the seller has agreed to sell, all the ice at a specified price, for a specified purpose, during a specified period of time, and limited to being performed in a stipulated locality, that

---

8. The other authorities upon which Union relies are similarly distinguishable. See, Eastern Transportation Company v. Blue Ridge Coal Corp., 159 F.2d 642 (2nd Cir. 1947) ; Loudenback Fertilizer Co. v. Tennessee Phosphate Co., 121 F. 298 (6th Cir. 1903) ; Dockson Gas Co. v. S. & W. Const. Co., 12 So.2d 847 (La.App.1943).

the buyer may elect to order, i. e., capriciously desire to order within the limits of his needs, in consideration of the promise of the buyer, as the owner and operator of a then established ice business, not to buy any ice for the specified purpose elsewhere than from the seller during the contract period, is to be upheld on its face as being supported by a sufficient legal consideration to sustain an action at law based upon its repudiation and consequent breach by the seller."

It is also noteworthy that the views of Professor Corbin are in accord with this result. In 1A Corbin, Contracts, § 156, p. 33 (1963), he states:

"It is true that by such a promise as this, the promisor may not undertake to continue a business on its present scale or even to run the business at all. It is true that the amount that will be needed or required will vary with the scale on which the business is run. Much, therefore, is left to the judgment of the promisor, even to his will and desire; but not everything is thus left. The promise contains one very definite element that specifically limits the promisor's future liberty of action; he definitely promises that he will buy of no one else. If he needs or requires or uses any of the named commodity, he must buy it of the one specified.

"Promises of this type have various forms; and the extent of the limitation they impose varies accordingly. The following are examples of valid bilateral contracts: (1) A promises to sell on stated terms, and B promises to buy, all the coal that may be used by certain vessels then owned by B. Here, B is privileged to withdraw his vessels from service and buy no coal at all. He is privileged, also, to install oil burning boilers or a gas engine, and buy no coal. But no coal for their use may be bought of anyone other than A; if the vessels use coal, it must be coal purchased of him."

III

Having concluded that the contract was supported by sufficient consideration and is enforceable, attention must now be given to two additional points advanced by Union: (1) that the City has unilaterally changed or expanded the contract from one for standby or alternate fuel to one for primary or base fuel; and (2) that the City's new interchange agreement with Tampa Electric Company has resulted in an enlargement of purchases not contemplated by the parties.

██ The first of these contentions is easily subject to summary disposition. There can be no doubt that the contract specifications as prepared by the City, and ultimately the contract itself, had the object of securing to the City a contract source of Bunker "C" oil as an alternate or standby fuel at a fixed, delivered price. Indeed, the specifications recited that "natural gas is, at the present, the base fuel at the Larsen Memorial Power Plant and . . . oil is presently regarded as a standby or alternate fuel to be used only when natural gas is unavailable . . ." It is equally clear, however, that the City took care in preparing the specifications to provide for the possible future use of oil as a primary or even an exclusive fuel. Specific reference was made in the early portions of the specifications to the use of oil as a primary fuel in the event the supply of natural gas was curtailed or interrupted, or the price of oil became lower than the price of natural gas, followed later by the broad and sweeping provision that the City would have an "option to increase the above requirements at any time and by any amount throughout the life of the contract in order to meet the [sic] 100% of the fuel requirements of the City's power plants."

The fact that the City ultimately began purchasing more oil than natural gas can hardly be described as beyond the contemplation of the parties or the purview of the contract specifications.

The effect of the new interchange agreement with Tampa Electric Company is a more troublesome proposition. As noted earlier, that new agreement was made in April, 1969. Prior to that time, for many years, the arrangement between the City and Tampa Electric was governed by a letter which provided for little more than an exchange of energy at certain rates when either party so requested, but always dependent upon the sole discretion of the other concerning its capacity to comply. Under this arrangement it appears that the net exchange was relatively insignificant insofar as the City was concerned. During the first year of its contract with Union (July 15, 1968 through July 15, 1969), for example, the City generated approximately 565,855,000 net kilowatt hours of electricity, and it sold net to Tampa Electric approximately 3,868,500 kilowatt hours, or substantially less than 1% of its total electrical production.

The new interchange agreement of April 21, 1969, however, was considerably more detailed and sophisticated. Among other things, it defined four distinct classes of energy and the means of computing the rate or price of each class. One of these was designated as "Economy Energy Interchange Service" and, as that description implies, was simply defined as energy which one party could produce and provide at a lower cost than the other. The evidence developed in the case to date does not reveal the amount of energy exchanged in each class between the City and Tampa Electric since April, 1969, but only the net totals regardless of class (i. e., all classes).

Thus, during the period July 16, 1970 through July 15, 1971 (the third year of the contract between the City and Union Oil), the City generated approximately 692,565,000 net kilowatt hours of electricity and sold approximately 32,137,500 net kilowatt hours to Tampa Electric, or 4.64% of its total production. During the next six months, through December, 1971, the City generated approximately 388,045,000 net kilowatt hours and sold approximately 52,237,000 net kilowatt hours to Tampa Electric, or almost 13.5% of its total production. It must also be remembered in considering these figures that the substantial increase in the market price of oil occurred in August or September 1970, after which the City enlarged its purchases of oil from Union.

It has already been determined that the agreement between the City and Union was a valid contract and, to be sure, the City purchased 736,348 barrels of oil during the third year of the agreement term whereas the contract contained a stated estimate of 18,000 barrels of oil per week (936,000 barrels per year) that the City might elect to take in the event the contract price of oil became lower than the price of gas. It might be said, therefore, that Union is in no position to complain about the increased sale of energy to Tampa Electric since the City's purchase of oil was still below the quantity estimated in the agreement. The stated estimate of 18,000 barrels per week, however, was an obvious reference to the City's *total* anticipated fuel requirements exclusive of the take-or-pay minimum in its contract with the natural gas company; and the total fuel consumption during the third year of the Union contract was equivalent to approximately 1,318,411 barrels of oil.

Florida Statute 672.306(1) (1971), F. S.A., Section 2–306(1) of the Uniform Commercial Code, provides:

> "(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate of in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

See also, C. A. Andrews Coal Co. v. Board of Directors of Public Schools, supra; and 1 A Corbin, Contracts, § 156, pp. 37–38 (1963).

■ The simple fact is that Union entered into an agreement which later proved to be improvident, from its point of view, when the market price of oil advanced to unforeseen heights. The City, on the other hand, realized a concomitant advantage; and that is precisely what the business and the law of contracts is all about. This is not to say, however, that the City may add insult to injury by taking undue advantage of its favorable contract and increase its wholesale exchange of energy with a neighboring system. Such increases must be regarded as beyond the contemplation of the parties and the scope of the contract, and must be taken into account as a limiting factor in determining the damages to be awarded to the City.

### IV

The pre-trial stipulation of the parties contained a provision that in the event the contract should be held valid ". . . then Lakeland shall have the right or option to extend the term of the Sales Agreement until July 15, 1974 . . ." This was an obvious reference to, and construction of, that portion of the contract specifications providing that the agreement ". . . may be renewed yearly not to exceed five years."

Union now seeks, by separate motion, to be relieved of this stipulation on the ground that any construction of the contract is a matter of law, not fact; that another portion of the stipulation disclaimed any agreement between the parties as to any issue of law; and that it inadvertently agreed to that part of the stipulation concerning the extended term.

■ The rules of this court require that counsel confer in advance of the pre-trial conference for the purpose of preparing and filing a pre-trial stipulation. Such agreements supplant the pleadings, clarify and narrow the issues, and are of inestimable value to the parties and the court in controlling the trial and future course of the litigation. They are binding compacts and should be strictly enforced. While no one would question the power and duty of the court to modify a stipulation when necessary to avert manifest injustice, the party seeking relief must sustain a heavy burden by demonstrating such injustice with clear and convincing force.

■ Implicit in Union's request for relief is the contention that the option provision "may be renewed yearly not to exceed five years" must be construed, as a matter of law, to include the initial one year term of the contract and does not contemplate five additional years thereafter. If the pertinent decisional authorities uniformly supported that construction of this or substantially similar language in contracts generally, then Union would doubtless be entitled to relief. Otherwise, the stipulation would be tantamount to an unintended amendment of an essential term of the contract itself.

In this instance, however, the position now taken by Union is merely debatable at best. Indeed, there is authority in support of the construction agreed upon in the stipulation. Keith v. McGregor, 163 Ark. 203, 259 S.W. 725 (1924); First-Citizens Bank & Trust Co. v. Frazelle, 226 N.C. 724, 40 S.E.2d 367 (1946). Also see, 50 Am.Jur.2d, Landlord and Tenant, § 1161, and 172 A.L.R. 421, 426.

Under these circumstances, therefore, since the stipulation accords with applicable law in any event, Union's motion is denied.

### V

A separate order will be entered by the court scheduling additional hearings concerning the assessment of damages and other relief to be awarded in keeping with the views and conclusions expressed in this opinion.