McBRIDE, Judge.
This is an expropriation suit brought by the Orleans Parish School Board (hereinafter sometimes referred to as “school board” or “board”) to secure for junior-senior high school purposes a rectangular-shaped parcel of ground having an aggregate area of 25 acres, located in the Gentilly section and composed of Groves (Plots) 86, 88, 90, 92 and 94 of Section 24 of the New Orleans Lake Shore Land Company Tract. Defendant landowner filed a general denial to plaintiff’s allegations and specially denied that any of the property is required for school purposes, and, in the alternative, denied that all of it is needed. Defendant also averred her ownership of certain land immediately to the south of the property plaintiff seeks and sets up that if plaintiff is successful, she will be left with a triangular-shaped plot which the expropriation has left seriously impaired in value. *547 She prays for a dismissal of the suit and, alternatively, that any expropriation -be limited to the extent of land reasonably needed by plaintiff, and that she have judgment for the market value of the land, together with severance damages to her remaining property adjacent thereto.
Defendant subsequently interposed an exception of no cause of action grounded on the contention that plaintiff’s allegations are insufficient in law to sustain a judgment of expropriation in that the petition does not set forth the specific use to which the land is to be dedicated or the extent to which the land “might be appropriate” therefor.
On November 14, 1962, the court below rendered judgment overruling the exception and dismissing defendant’s special plea that none of the property sought to be taken is necessary for the purposes alleged. Although the judgment decreed that the property is necessary for public school purposes, it limits the expropriation to IS acres (the front portions of the groves fronting on Read Road) instead of the 25 acres sought. Subsequently the question of the valuation of the property was tried, and after considering the evidence offered by both sides, the judge on March 19, 1963, rendered judgment awarding defendant $150,000 for the 15 acres expropriated and also $52,-000 for damages to her remaining property.
After depositing $202,000 in the registry of the district court, the school board took this appeal which defendant has answered praying that her special pleas and exception be maintained and that she have judgment dismissing plaintiff’s demands; alternatively, defendant prays that the valuation of the land be established at $180,000 and that the severance damages be increased to $123,038.03.
The school board contends that the trial judge erred in not permitting the full 25 acres to be expropriated, in fixing the market value of the 15 acres at $150,000, and in awarding severance damages of $52,000.
In the specifications of errors contained in appellee’s brief, she contends that the district court erred in finding that the locus is suitable for the placement of a school, and, alternatively, in not holding that the 15 acres have a fair market value of $180,-000, and in not awarding $123,038.03 as severance damages.
The exception of no cause of action was properly overruled below; plaintiff alleges it found it necessary to acquire the property for use in connection with the construction of a public school building, and we think this allegation suffices to refute, without further comment, the ex-ceptor’s contention that the allegations of the petition do not set forth the specific use to which the land is to be dedicated. We also think that the petition adequately sets forth the extent to which the land is appropriate for such use. It could not logically be deduced from the petition, in view of the board’s allegation that it is necessary to acquire the property for public school purposes, that the same is inappropriate for such use.
The Legislature has specifically delegated to parish school boards the power to determine the number of schools to be opened and the location of school houses. LSA-R.S. 17:81. This section further provides:
“ * * * that the Orleans Parish School Board shall have authority to prescribe the rules and the regulations to govern the building and equipping and repairing of school houses, and the dates of the meetings of that board.”
The Legislature has further provided that:
“Parish school boards may establish such public schools as they may deem necessary to provide adequate school facilities for the children of the parish, * * *. Central or high schools may be established when necessary, but no high school shall be established without the sanction of the state board of education. * * *” LSA-R.S. 17:151.
*548 All laws and all rules and regulations of the State Board of Education governing other parish school boards throughout the state apply to the Orleans Parish School Board. LSA-R.S. 17:122.
The Orleans Parish School Board is endowed with the power of eminent domain. LSA-C.C. art. 2626; LSA-R.S. 19:2.
At the outset of their argument before us, counsel for appellee contended that plaintiff has no right to stand in judgment in this suit because it did not allege and had never shown that it obtained the sanction of the State Board of Education for the establishment of the contemplated high school. This contention may be disposed of with but a brief statement. Plaintiff by this action is not endeavoring to establish' a high school, but merely seeks to acquire land suitable for the placement thereon of a high school.
The argument of appellee’s counsel to the contrary notwithstanding, the school board has shown both the necessity for the expropriation and the suitability of the property for public school purposes. This is shown by the testimony of Dr. Stanley Fitzpatrick who appeared as a witness for plaintiff school board. His qualifications as an expert appear from the evidence which shows he has served as Director of Research, Census and Planning for the Orleans Parish School Board since 1954; that he holds the degrees of Bachelor of Science and Master of Arts from Tulane University and Doctor of Education and Administration from Harvard University; that he has served as a member of the Planning Advisory Committee for the New Orleans City Planning and Zoning Commission since 1954 and is the incumbent Chairman of that committee.
The school board plans to erect and complete within three years a $3,000,000 multiple-story, sixty classroom complex (a junior-senior high school) on the site, designed to serve 1,800 students. The facility will serve for public school purposes in the area not merely for the present but for perhaps the next 50 or 75 years. Prior to recommending to the board that it acquire the property, Dr. Fitzpatrick studied its location and utility and the major street system in the general area, etc. His opinion was that the site is necessary, pointing out that there is presently no public junior or senior high school located east of the Industrial Canal; that as of November 1962, 1,121 children living east of the canal attend public junior and senior high schools in other sections of the city; he also gave statistics with reference to the number of children living east of the Industrial Canal presently enrolled in public schools, and from these it is obvious that with the passage of each year the number of educable children of junior and senior high school age in this section of the city will steadily increase.
Dr. Fitzpatrick also testified as to the facility and suitability of the site, but the soundness of his opinion thereof is vehemently assailed by the defendant as to location, elevation, accessibility, etc. There is some testimony that the land is of low elevation, and that after a heavy rainfall water accumulates thereon which stands for two or three days. However, Dr. Fitzpatrick points out that the board contemplates raising the elevation by fill 1 to lj/á feet and installing an adequate drainage system. Without going into a detailed discussion of the testimony respecting the feasibility of the board’s plan for filling and draining the property, we are satisfied that this can be accomplished. We are also convinced of the necessity for acquiring the property and the suitability thereof, and in our opinion the lands seem to be adaptable to school purposes.
There is nothing in the record which would indicate to an unbiased mind that the actions of the school board in selecting the site are manifestly arbitrary, unreasonable, fraudulent or in bad faith, and this court is powerless to substitute its judgment for that of the board which has *549 full discretionary powers with reference to the erection and location of school facilities.
In Hill v. De Soto Parish School Board, 177 La. 329, 148 So. 248, the Supreme Court said:
“ The establishment and location of high schools is left entirely to the discretion of the parish boards, subject to such limitations as may be prescribed by the state board. The discretionary powers vested by law in these boards as public bodies, as state agencies, will not be interfered with by the courts unless exercised in a manifestly arbitrary, unreasonable, or fraudulent manner. * * * ”
In 78 C.J.S. §15, Verbo Schools and School Districts, pp. 630, 631, we find this language:
“ * * * The courts ordinarily have no power to interfere in a controversy which concerns the proper administration of the public school system, * * *. While the courts have power in a proper proceeding to determine what the powers of school authorities are, and whether or not the authorities have exceeded them, the exercise of discretion by school authorities will be interfered with only when there is a clear abuse of discretion or a violation of law, and the burden of showing such an abuse is a heavy one. In other words, the courts are not concerned with the wisdom of the policy of school authorities, and they are without power to interfere with the policies of such authorities as long as they act in good faith within their statutory powers. ”
In the same volume, § 247, p. 1209, this language appears:
“ Generally the action of a school board or officers in selecting land for public school purposes will not be controlled by the courts, except for a manifest abuse of their discretion, violation of law, fraud, improper motives, or collusion. * * * ”
The Supreme Court in Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491, had this to say:
“The extent of property to be expropriated and the location thereof are within the sound discretion of the body possessing the power of eminent domain, and the determination of same will not be interfered with by the courts if made in good faith. Greater Baton Rouge Port Commission v. Watson, 224 La. 136, 68 So.2d 901, and cases cited therein. In City of Westwego v. Marrero Land and Improvement Association, 221 La. 564, 59 So. 2d 885, 886, we said: ‘While the expediency or necessity of an expropriation is a matter for judicial determination * * * nevertheless, the suitability -of the property sought to be expropriated for the purpose as stated is primarily a question of fact, on which the judgment of the district court will not be disturbed unless manifestly erroneous, and particularly when that judgment has constituted an affirmation of the determination of the expropriating authority, arrived at after due, impartial consideration.’ ” (Italics ours.)
Also with reference to the suitability of the land appellee contended in argument that other property would be more adaptable and could serve better for school purposes, but our answer is defendant’s appreciation of that is not the test whether the land sought should be expropriated. The availability or feasibility of the lands of others would not affect the school board’s right to condemn defendant’s property. See Central Louisiana Electric Co., Inc. v. Covington & St. Tammany Land & Improvement Co., La.App., 131 So.2d 369.
The controversy as to the extent of land necessary to serve the board’s purpose came in for strenuous argument by *550 both sides. From the board’s schematic plan showing the “proposed land use” it appears that the whole of the 25 acres would be utilized in the junior-senior school project. The plan, besides showing the location of several buildings, depicts parking areas, football fields, a baseball diamond, a boys’ and a girls’ softball diamond, and an athletic track which circuits the main football field. Without any evidence to the effect that only 15 acres would suffice for the uses intended, the trial judge arbitrarily limited the taking to that extent. Quoting from the reasons for judgment:
“Now, from my examination of this plat, which was furnished to the Court, it’s apparent that this plat was prepared by somebody who was simply trying to cover a 25 acre plot.
“From a practical standpoint, in the opinion of the Court, it is not practical to have two football fields. I see no reason, no reason at all, why a track couldn’t be placed around this practice field, and eliminate the other field entirely. I see no necessity of three ball diamonds. It is true that you may have several classes of physical education, but certainly they do not have to have one particular spot to go through gymnastics or whatever they are doing.
“In my opinion, the 25 acre tract is excessive, and, in my opinion, a 15 acre tract would be sufficiently large to provide ample acreage for school.”
The only testimony which can be considered as in any light being favorable to defendant in the matter of the adequacy of the 15 acres emanated from her witness Kuhn, a civil engineer, who testified in general that the schematic drawing showed that only 96,000 square feet would be occupied by buildings and 462,000 square feet by athletic facilities and parking areas.
Before making any recommendations to the school board, Dr. Fitzpatrick and his department made studies to determine the number of square feet of land that will be required taking into consideration the need for physical, recreational and athletic facilities. Resort was had to the views of authorities on school planning and construction and several of the books consulted form part of the evidence. In one, “The Planning and Construction of Louisiana School Buildings,” Bulletin No. 711, issued by Shelby M. Jackson, Louisiana State Superintendent of Education, at page 52, are these observations:
“ * * * For junior and senior high schools, it is suggested that there be provided a minimum site of ten acres, plus an additional acre for each 100 pupils of predicted ultimate maximum enrollment. Thus a high school of 500 pupils would have a site of 15 acres.’
“The minimum formula as recommended by the National Council on Schoolhouse Construction should be exceeded by all schools to the extent that the site will accommodate predictions of future growth for an expanding educational program in a community-centered school.
# % Sjí % ❖ #
“Usually a rectangular shape is preferred for the school site. It is easier to arrange buildings, drives, parking spaces, play and recreational areas, service areas, and fields for sports on a rectangular plot than on an irregularly shaped site. * * * ”
All the authorities referred to bespeak the tendency toward a larger ground area:
“ * * * The necessity for larger sites is due to a number of trends such as: (1) space for outdoor teaching areas; (2) single-story structures; (3) single-loaded corridors; (4) campus and cluster-type layouts; (5) the little-school, or the school-within-a-school concept of school organization; (6) consolidation of attendance areas resulting in larger schools, more buses, *551 and regulations and practices requiring on-site bus loading and unloading; and (7) parking space for the ever-increasing number of teacher and pupil cars.” “Guide for Planning School Plants,” 19S8 Ed., by The National Council on Schoolhouse Construction, p. 22.
“ * * * The American Association of School Administrators and the National Council on Schoolhouse Construction are in agreement in recommending for an elementary school at least five acres plus one acre for each 100 pupils in ultimate enrollment and for a secondary school at least 10 acres plus one acre for each 100 pupils. Thus, an elementary school that will ultimately, have 300 pupils should have a site of at least eight acres, while a secondary school of the same size should have 13 acres. It must be kept in mind that these are minimum sizes and that larger areas are usually advisable where they can be obtained.
“ * * * Sites of 10 to 20 acres for elementary schools and of 25 or more acres for secondary schools are being selected with increasing frequency, and the uses to which they are put should be. of interest to anyone trying to decide how much land to acquire. The long-range plan for the development of one 80 acre secondary school site is shown in Figure 4. * * * ” “From School Program to School Plant,” by Herrick, McLeary, Clapp and Bogner, p. 242.
“School boards which have purchased 10 to 15 acres for elementary schools; 30 to 40 acres for junior high schools (grades 7-9); and 40, 50, or more acres for senior high schools, have rarely regretted the action. * * * ” “School Planning and Building Plandbook,” by Engel-hardt, Engelhardt, Jr., and Leggett, p. 184.
“High schools with sites of forty and fifty acres, and elementary schools with ten and twelve acres, can be found in many regions of the United States, particularly where population growth has moved toward suburban areas. Nevertheless, schools with adequate sites are the exception rather than the rule today.” “Planning Functional School Buildings,” by Sumption and Landes, p. 171.
“The educational program planned for a site should determine its size. More often than not, false cost analysis reverses the emphasis. Program trends call for more area; school site sizes will continue to be larger. The physical education program is becoming a regular daily experience for more and more students. Many laboratory sciences need outdoor space. Building areas are becoming more decentralized. More and more students drive their own cars to school; driver education is becoming a program 'must.’ More area is being devoted to designed landscaping which not only serves total educational needs but also such non-esthetic functions as noise, dust and temperature control.” “Schools for the New Needs,” published by F. W. Dodge Corporation, p. 4.
Appellee points up that most of the 25 acres will be utilized for unnecessary athletic fields and to provide automobile parking space and, hence, it is argued that the major portion of the ground area sought to be expropriated will not be used for educational purposes and, therefore, an excessive amount of defendant’s property is being sought.
We have it from the experts that more and more stress is being placed on physical education which necessitates additional recreational and athletic facilities. The extent to which physical, recreational and athletic activities form part of educational curricula we do not know, and there is no reason why we should not accept the evidence offered by plaintiff that provision *552 should be made for these endeavors in the planned school facility, especially when no countervailing' expert evidence was offered by the defendant. Such matter should best be left to the judgment of experts.
We are also told that more and more students and teachers drive their own automobiles to and from school and that off-street parking is not only desirable but necessary. Again we say we cannot see why the new schoolhouse should not have facilities for this purpose.
The determination of the extent of the land necessary in connection with the proposed new school complex being vested in the -sound discretion of the board and there having been no showing that such discretion has been abused or that there was bad faith, this court should offer no interference to the appropriation of the 25 acres. The evidence shows the board acted wisely. The trial judge fell into error in limiting the taking to 15 acres. There is not an iota of evidence supporting the validity of his conclusion.
The most serious issue is the value of the land. The measure is the market value at the date of the taking. Market value has been defined as that price which a willing buyer and a willing seller would agree upon taking into consideration all uses to which the property may be put. State of Louisiana, through the Department of Highways v. Barber, 238 La. 587, 115 So.2d 864. It is well settled that the best method of determining market value is through study of sales of comparable property. State of Louisiana, through Department of Highways v. Central Realty Investment Company, Inc., 238 La. 965, 117 So.2d 261.
The extent of the property owned by the Brown interests, of which the acreage the school board seeks forms part, aggregates about 5,000 acres. Thompson, defendant’s manager, stated that no legitimate offer to purchase the property has been received, and that he did not anticipate that anyone would desire to buy the property within the next ten years. He described the terrain thus:
“ * * * It’s a vast swamp, and I spend, oh, probably a day every week out there. We have a cattle ranch at the extreme eastern end of the property and it’s infested with mosquitoes and cotton mouth moccasins, rattlesnakes, and it’s under water a good part of the year, the majority of the property.”
Defendant’s counsel argue that the best use to which the property could be put would be for residential purposes. They make the claim that the 25-acre tract is the most desirable of all of the land owned by the Brown interests and this because of its proximity to nearby and well-developed subdivisions and to the Joe W. Brown Memorial Park. They say that there is easy access to utilities and stress that the property fronts on Read Road which is already in existence. It is said that all of this is conducive to the future development of the land.
Yet, on the trial of the case defendant’s counsel at one point paradoxically stated:
“May it please the Court, if counsel is attempting to prove that the problem of drainage in this area was so difficult that they make its future development impossible and remote, we’re willing to stipulate that.”
Defendant is contending that the fair market value of the land is- $12,000 per acre.
Sales of comparabte property in the vicinity are not numerous. We are referred to two which defendant’s counsel believe most indicative of value.
The first of these sales is by Williams to Recile, on July 6, 1961. The property consists of Grove 25 of Section 22 and Grove 67 of Section 10, a total off 10 acres which are not contiguous. The sale price *553 was $160,000 or $16,000 per acre. One of the groves is near the proposed interstate highway and the other fronts on the north side of Morrison Road, some distance from the property the school board seeks.
The other sale concerns Groves 21 and 23 of Section 22, containing a combined area of approximately 10 acres which is also located at a considerable distance from the 25 acres involved in this suit. Uhl originally sold to Recile on March 29, 1962, for $66,-000. Subsequently the property was re-sold to several persons for $160,000 or $16,000 per acre.
Derbes, one of plaintiff’s real estate experts, does not consider the $16,000 per acre as being representative of fair market value. He testified that Recile attempted to subdivide Groves 21, 23 and 25 of Section 22 into lots fronting on the presently incom-pleted interstate highway which he proposed selling separately to a number of individuals. His venture proved unsuccessful, so he sold to certain purchasers in indivi-sión. Simultaneously, an act of partition was executed by the purchasers which contained a condition suspending the effect of the partition until a subdivision thereof would be approved by the city. For those reasons plaintiff’s experts felt that this isolated transaction was of a speculative and promotional nature and that the price of the land did not reflect its true market value. There is also some testimony from Derbes that the plan of the Department of Highways to establish a traffic interchange at Crowder Road tended to give Groves 21, 23 and 25 of Section 22 a greater value than the property we are interested in. On behalf of plaintiff certain sales of property were pointed to in order to bear out its contention that the land is not worth more than $4,500 per acre. The comparables relied on involve property located at a considerable distance from the 25 acres and somewhat remote in the point of time. One is a sale in 1960 of certain property for $1,600 per acre, but we are inclined to believe that this price is too low and must not be considered due to certain special circumstances which need not be mentioned here. There was a sale of 10 acres at $4,000 per acre in 1958. Another sale in the same year was made for $2,500 per acre, but the property is lower than the 25 acres and has no access to a major road. Other sales pointed to by plaintiff range from $5,000 per acre to $6,250 per acre.
Derbes, one of plaintiff’s experts, placed a valuation of $5,000 per acre on the land; another, A. B. Nicholas, thought it was worth $4,500 per acre while J. C. Salvant, a real estate expert who appeared on behalf of defendant, said he estimated that the land was worth $12,000 per acre. We agree with the trial court that:
“ * * * the value placed by Max J. Derbes and A. B. Nicholas is entirely too low. The valuation placed by J. C. Salvant is too high, * *
The trial court concluded the property was worth $10,000 per acre. Our appreciation of the evidence leads us to the belief that the figure $10,000 per acre is excessive and that a fair valuation would be $7,500 per acre.
Finally, defendant’s claim for damages to her remaining property resulting from the expropriation must now be discussed.
Under Art. I, Sec. 2, Const. 1921, LSA, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid. It is the settled jurisprudence that damages allowable under Sec. 2 of Art. I of the Constitution resulting from expropriation of property rights is the difference between the market value of the property immediately before and immediately after the expropriation. State of Louisiana, through Department of Highways v. Central Realty Investment Company, Inc., supra.
Defendant claims that some of her property fronting on the east side of Read *554 Road immediately opposite the 25 acres expropriated by plaintiff will be damaged as a result of the expropriation. The land in question measures 2,345 feet front by 200 feet in depth. None of the evidence satisfies us that this particular portion of property will be in any wise damaged, and our conclusion is defendant is not entitled to recover for the alleged damages thereto.
As set up in her answer defendant also owns Groves 96, 98 and 100, forming á triangular portion of ground containing 16 acres, immediately adjoining on the south the 25 acres expropriated. The trial court awarded $2,000 per acre for the damage the 16 acres will sustain and also the same amount per acre for the remaining 10 acres which he refused to permit plaintiff to appropriate. Whereas we have permitted the expropriation of the 10 acres, left for consideration in the matter of severance damages are the 16 acres above mentioned. The testimony presented by defendant to prove damages to the triangular portion is, to say the least, vague and confusing. Gandolfo, an engineer appearing for defendant, testified that the filling of the 25 acres by the school board would damage defendant’s 40 surrounding acres to the extent of $1,000,000 because of drainage problems. On the other hand, DiBene-detto, assistant engineer of the Sewerage & Water Board, a plaintiff witness, stated the elevation of the 25 acres would not “upset” the drainage of the Brown tract. Salvant stated that the triangular portion would sustain damage to the extent of 50 percent of its valuation of $12,000 per acre. Wagues-pack, the other real estate expert who appeared for defendant, stated that there would be $200,000 in damages, but this estimate is based on an area of 700 acres.
Plaintiff’s expert, Nicholas, testified that the remainder of Mrs. Brown’s property would suffer no damages by the severance of the 25 acres therefrom; while, on the other hand, Derbes, plaintiff’s other expert, testified that he estimated that the triangular portion would sustain damages to the extent of $5,000.
In view of the testimony emanating from Derbes, undoubtedly the triangular portion of 16 acres will have less value for the purposes of subdivision and thus will be damaged as a result of the taking of the 25 acres. But we think the court erred in fixing the damages at $2,000 per acre. That estimate seems to be too high. We believe that an award of $1,000 per acre would do substantial justice in the matter of severance damages for the diminution in value of the 16 acres, and defendant should recover $16,000.
For the reasons above assigned, it is ordered, adjudged and decreed that the judgment dated November 14, 1962, be amended so as to recognize the right of Orleans Parish School Board to expropriate the 25 acres as described in said judgment, viz. the whole of Groves 86, 88, 90, 92 and 94 of Section 24.
It is further ordered, adjudged and decreed that the judgment dated March 19, 1963, be amended so as to provide that there be judgment condemning and adjudging the 25 acres unto the Orleans Parish School Board upon its depositing in the registry of the trial court the sum of $203,500, of which $187,500 represents the value of the land expropriated and $16,000 represents damages. Against the above amount the Orleans Parish School Board is to be credited with the sum of $202,000 already deposited in the registry of the court.
And as thus amended, and in all other respects, the judgments appealed from are affirmed. Defendant is to pay the costs of both courts.
Amended and affirmed.