401 So.2d 600 (1981)
W. F. HENRY, Jr., Individually and as Trustee For J. A. and Martha Davis Trust, et al., Plaintiffs-Appellants-Appellees,
v.
The BALLARD & CORDELL CORPORATION, et al., Defendants-Appellees-Appellants.
No. 8267.
Court of Appeal of Louisiana, Third Circuit.
June 30, 1981.
Rehearing Denied August 13, 1981.
*601 Jones, Jones & Alexander, Jerry G. Jones, Cameron, for plaintiffs-appellants-appellees.
Gene Lafitte and Lawrence R. Simon, Jr., of Liskow & Lewis, Lafayette, for defendants-appellees-appellants.
Before DOMENGEAUX, GUIDRY and SWIFT, JJ.
DOMENGEAUX, Judge.
Certain gas leases executed in the 1950s and early 1960s provided that lessors would receive as royalty a percentage or fraction of the market value of the gas sold. Lessees have paid royalty amounts based upon the amounts they have received from the interstate purchaser of the gas under the terms of a twenty year gas sales contract executed in 1961. Lessees contend that the purchase price represented the fair market value of natural gas in 1961, and that that value is the one plaintiffs' royalties should be based upon. Lessors claim that their royalties are to be calculated and paid on the basis of the current market value of natural gas, not on the basis of the price received by lessees for the gas.
The issue we must decide: Is the amount due the lessors as royalty under these leases *602 to be based upon the prevailing market value at the time the gas was committed to the purchaser by the lessees under a long term gas sales contract, or is the royalty to be based instead upon the current market value determined on a daily basis the moment gas is produced and/or delivered to the purchaser?
This issue has never been decided by a court of this state and its ultimate resolution is certain to have a substantial impact upon the parties involved as well as many other similarly situated lessors and lessees.[1]
The mineral leases involved in these two consolidated cases[2] affect property in the Calcasieu Pass Field in Cameron Parish. The leases, and the various plaintiffs claiming as lessors thereunder, are as follows:
(a) "Davis Lease No. 1" dated March 19, 1953;
(b) "Davis Lease No. 2" dated December 10, 1960;
(c) "Davis Lease No. 3" dated June 22, 1964; and
(d) "Rogers Lease" dated September 7, 1962.
Plaintiffs in No. 8267 suing as lessors under all three Davis leases are: W. F. Henry, Jr., as Trustee for J. A. & Martha Davis Trust for Mary Henry, Wilma Guthrie, Furman Davis, and Lonnie Davis, Mary Davis Henry, and Wilma Guthrie.
Plaintiffs in No. 8268 suing as lessors under the Rogers lease are: Milford A. Rogers, J. B. Jones, Jr., Faye Jones, Jerry G. Jones, Jr., and Jerry G. Jones representing the minor child Lori Sue Jones.
The pertinent gas royalty provisions of these four leases provide as follows:
(a) Davis Lease No. 1:
"(b) on gas ... sold or used off the premises ... the market value at the wells of one-eighth of the gas so sold or used ..."
(b) Davis Lease No. 2:
"(b) one-sixth (&frac14th) of the market value of the gas sold or used ...."
(c) Davis Lease No. 3:
"(b) 18.5% of the market value of the gas sold or used ...."
(d) Rogers lease:
"(b) On gas ... sold or used off the premises .... the market value at the well of one-fourth (¼th) of the gas so sold or used...."
The cases were tried on a consolidated basis without a jury on April 21 and 22, 1980, and the trial court rendered a single judgment disposing of both cases. The judgment was rendered in favor of the above-named plaintiffs-lessors, and against the following defendants in both suits: Wiley P. Ballard, Jr., Robert M. Cordell, Lay Exploration Corporation, the George Williamson Estate, Herman W. Lay as Trustee of William B. Oliver Trust, Herman W. Lay as Trustee of Agnes Cluthe Oliver Trust, Arthur L. Montgomery, Shenandoah Oil Corporation, Karl F. Hagemeier, R. E. Kellerman, Millcreek Oil Company, Miss Sondra Press, Hal B. Wallis, Gwendolyn P. Weiner, Arthur O. Wellman, Ted Weiner Oil Properties, Charles Weiner, Mary Don Weiner, Diana Weiner, Stanley Weiner, Charles Weiner Trustee, Texas Crude Oil Company, Texas Crude, Inc., and H. J. Lasieur, in proportion to their ownership interests in the various leases. In addition, judgment was rendered against Robert R. Durkee, Jr., in No. 8267 only.
The defendants have appealed from that portion of the judgment requiring them to pay additional royalties under the Davis and Rogers leases. The plaintiffs have appealed from the court's denial of their claim for double damages under La. R.S. 31:140.

TRIAL COURT DECISION
The trial court held that the market value provisions of the royalty clauses in the *603 three Davis leases and the Rogers lease require that royalties be settled on the basis of current sales,[3] including sales made in the intrastate market through November, 1978, and that thereafter, market value is determined by reference to Section 109 of the Natural Gas Policy Act of 1978. Based on this holding, the court ordered defendants to account to plaintiffs from September, 1976, through the date of judgment for the difference between the proceeds actually received and the "market value" of the gas attributable to the fractional share of the plaintiffs. The court also ordered that henceforth, royalties must be based on the prices published by the Federal Energy Regulatory Commission (FERC) applicable to Section 109 under the Natural Gas Policy Act of 1978.
In its opinion the district court adopted this definition of market value:
"... the market value of a thing is the price which it might be expected to bring if offered for sale in the market."
Defendants contend that the plaintiffs' royalties should be calculated by using the 1961 market value of natural gas since that is when the gas sales contract was executed between the Ballard & Cordell Corporation (Ballard and Cordell), the operator of the leases,[4] and the American Louisiana Pipeline Company (later to become the Michigan Wisconsin Pipeline Company), the interstate purchaser of the gas production. According to defendants, the sale was complete at that time because there existed an agreement for the object and price, although the object was not yet delivered nor the price paid. La. C.C. Art. 2456.
The trial court rejected defendants' argument, relying upon the principle that the sale of minerals still in the ground is no sale at all; it is merely the creation of a real right. The court concluded that a fugacious mineral becomes subject to a true sale only when it has been reduced to possession; since natural gas, unlike crude oil, is never stored, it cannot be reduced to possession (and thus cannot be subject to ownership or the object of a sale) until it is actually in the defendants' pipeline; only then, after it is in the pipeline, can the market value of that particular gas be determined; and since this reduction to possession occurs on a daily basis, the relevant comparison would be to sales occurring at the same time.
Defendants argued in the alternative that if "market value" in plaintiffs' leases meant current market value determined on a daily basis as the gas is reduced to possession, then the only comparable sales which should be considered to establish the current market value are sales of gas committed to the federally regulated interstate market since this gas was sold in that market; sales of gas in the unregulated intrastate market should not be considered.
Defendants proposed this argument because prices paid by intrastate purchasers of natural gas had, from the early to the late 1970s, far outstripped the maximum allowable price for interstate gas set by the FERC. If the lessors were adjudged to be entitled to additional royalties, and the current market value of gas destined for the interstate market was determined by higher prices paid for gas on the intrastate market, then the lessees would be forced to pay as royalty for lessors' fractional interest *604 a substantially higher price than they would if only interstate sales were considered.
The court rejected this argument too and held that the current market value should be determined by sales of gas in the intrastate market as well as the interstate market. The court reasoned that use of the restricted interstate market as the sole criterion for determining the "market value" standard provided by the leases would amount to a re-writing of the leases.
We reverse the trial court judgment. We find that the parties intended for the royalties to be governed by the market value of natural gas which prevailed in 1961 when the gas was committed to the purchaser under the gas sales contract rather than by the current market value, to be determined on a daily basis as gas is produced and/or delivered to the purchaser. Although we agree with the trial court that the market value of a thing is the price which it might be expected to bring if offered for sale in the market, we do not agree with its conclusion that the term market value, standing alone, clearly means current market value.
We need not reach and hence will not consider whether sales of gas in the intrastate market should be considered when determining the market value of gas committed to the interstate market. We also need not reach and will not consider the plaintiff's claim for double damages under La. R.S. 31:140 since we decide they are not entitled to any damages.

HISTORICAL OVERVIEW
According to unrefuted evidence presented by the defendants, including expert testimony,[5] natural gas was very plentiful in 1961 when Ballard & Cordell sought a market for the gas in the Calcasieu Pass Field. Because of the field's geographically isolated position,[6] there was but one economically feasible market for the gas. This market was the American Louisiana (now Michigan Wisconsin) Pipeline Company, an interstate purchaser of natural gas. However, because of the abundant supplies of natural gas existing at the time, a buyer's market prevailed. Ballard & Cordell was essentially offered a "take it or leave it" contract by American Louisiana which included a provision that Ballard & Cordell construct a pipeline from the Calcasieu Pass Field to connect with an American Louisiana pipeline one mile to the north.
Acting as a prudent operator obliged to market the natural gas if a market exists,[7] Ballard & Cordell agreed to sell the gas to American Louisiana as per the latter's offer. The agreement was to remain binding for a maximum period of twenty years from the effective date of September 27, 1961. American Louisiana agreed to pay 18.25 cents per 1,000 cubic feet of gas (mcf) during the first five-year period, commencing upon the date it first took or was obligated to pay for the gas; 20.75 cents per mcf during the second five year period; 23.25 cents per mcf during the third five year period; and 25.75 cents per mcf during the remaining period.
The evidence conclusively established that twenty year (or life of the lease) gas sales contracts were customary in the natural gas industry in 1961. The marketing of natural gas requires the connection of the gas production to a pipeline to move the gas *605 to a point or points where it can be consumed. In order to obtain financing, and, in instances where governmental regulation is involved, regulatory approval to construct or extend a pipeline system to facilitate the marketing of gas, a pipeline company or other purchaser of the gas had to acquire and be able to show sufficient long-term supplies of gas to amortize the expense.
Other evidence established that Ballard & Cordell obtained a price that was as good as or better than prices in comparable sales made at that time, despite the fact that a buyer's market prevailed. Furthermore, the price escalation clause was among the best contained in any such sales.
There is no dispute that the negotiations between Ballard & Cordell and American Louisiana were conducted in good faith and at arm's length and that the resulting contract was very favorable for the plaintiffs as well as the defendants.
Prices paid for natural gas remained stable throughout the 1960s and early 1970s. After that time, the prices paid for natural gas by intrastate purchasers, who were free to pay whatever price was necessary to acquire gas supplies, far surpassed prices paid by interstate purchasers, because the federal government carefully regulated the prices that could be paid for natural gas production by interstate purchasers. This disparity continued until Congress passed the Natural Gas Policy Act, which became effective December 1, 1979. Since then both interstate and intrastate sales of natural gas have become subject to federal price controls. The end result is that there is no longer a price disparity and the two markets are competitive again.

MARKET VALUE
In order to ascertain the true intent of the parties to the leases, we are guided by several pertinent rules of contract construction found in the Louisiana Civil Code, which provide as follows:
"Art. 1945:
Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

First___That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
Second___That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
Third___That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

Fourth___That it is the common intent of the partiesthat is, the intention of all that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract." (Emphasis added).
"Art. 1950:
When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."
"Art. 1951:
When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nugatory."
"Art. 1955:
All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act."
"Art. 1956:
When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."
The contract term "market value" as used in the royalty provision of the various leases is susceptible to two interpretations: The plaintiffs-lessors contend the term necessarily means that their royalties must be based upon an ever-changing market value *606 of natural gas which is to be determined on a daily basis as gas is produced and/or delivered to the gas purchaser; the defendants-lessees contend that the parties meant for lessors' royalties to be based upon the prevailing market value at the time the gas reserves were committed to the purchaser under the 1961 contract.
The trial court concluded that the term "market value" should be used in the sense in which it is commonly understoodthe price which a thing (here natural gas) might be expected to bring if offered for sale in the market. Then the court concluded that since natural gas cannot be sold until it is actually delivered, then the "market value" of "gas sold" clearly meant plaintiffs' royalties on each unit of gas were to be based upon the then current market value of natural gas as the gas was delivered to the gas purchaser.
To reach its conclusions the trial court relied upon these three rules of contract construction: 1. The contract is the law between the parties; 2. The clear language of a contract must be enforced; and 3. In case of an ambiguity a contract must be construed against him who prepared it.
We recognize all three as established rules of contract construction, but find that the latter two are not pertinent. "Market value" has the commonly accepted meaning attributed to it by the trial court, and that meaning prevails here, but the language in the leases does not clearly indicate whether the parties intended for the royalties to be calculated from the market value which prevailed when the gas was committed to the buyer in 1961, or from a current market value to be determined on a daily basis as gas is produced and/or delivered to the purchaser. Hence we think the trial court erred in concluding that the true and common intent of the parties could be determined by resorting only to the "market value" clause of the royalty provisions of the leases, without regard for other clauses which indicated a contrary intent, as well as the circumstances which existed at the time the leases were confected.
By its use of the ambiguity rule, it appears that the trial court found the leases ambiguous and construed them against the defendants-lessees on the assumption that the lessees prepared the leases. There was no evidence presented from which the court could reasonably have concluded that the lessees in these cases had prepared the leases. Even if we assume that the lessees did prepare these leases, however, we are bound, first, to ascertain the common intention of the parties in a doubtful situation, rather than to adhere to the literal sense of the terms. C.C. Art. 1950. Only if we cannot ascertain the common intention of the parties do we construe the ambiguous clause against its preparer. C.C. Art. 1957; Fee v. Vancouver Plywood Co., Inc., 331 So.2d 151 (La.App. 3rd Cir. 1976); writ denied 334 So.2d 434 (La.1976). Since we find that the common intention of the parties is ascertainable from the evidence, construction against the lessees was erroneous.
We find that the parties intended for the lessors' royalties to be based upon the prevailing market value for natural gas at the time these natural gas reserves were committed to American Louisiana in 1961. This interpretation espoused by the defendants-lessees is supported by the evidence and is the only one under which the common intent of all the parties can be realized. The plaintiffs-lessors' interpretation is not supported by the evidence, and its adoption would lead to results never intended by the parties, as we will explain later.

EVIDENCE
According to C.C. Art. 1956, quoted supra, when the intent of the parties is doubtful, the manner in which the contractual obligations have been executed by both parties, or by one with the express or implied consent of the other, furnishes a rule for the interpretation of their intent.
For more than three-fourths of the life of the gas sales contract (1961-1978) the plaintiffs acquiesced in the manner in which the defendants, through Ballard & Cordell, calculated and paid their (plaintiffs') royalties. During all those years the defendants paid *607 in royalties on the Davis Nos. 1, 2, and 3 and Rogers leases 1/8th, 1/6th, 18.5%, and ¼th respectively of the proceeds received from the gas purchaser. Plaintiffs never objected to this method of calculation until 1976 when they sent a letter to Ballard & Cordell complaining that the royalties paid were less than the then current market value. However, plaintiffs in No. 8267 did not file a suit for accounting until March of 1978, while plaintiffs in No. 8268 waited until February of 1979 before filing their suit.
Plaintiff's long-standing acquiescence in the defendants' method of calculating and paying royalties would alone probably be a sufficient basis for adopting the defendants' interpretation of the "market value" provisions in the subject leases. However, other uncontradicted evidence leaves no doubt that only the defendants' interpretation reflects the common intention of all parties.
One of the defendants' expert witnesses, Mr. Bolton, testified that the "market value" clause is a "lessee clause", that is, it was originally intended to protect the lessee. As Mr. Bolton explained, the original royalty clause in oil and gas leases was designed when gas was not a very important mineral. As the gas markets developed, it sometimes became necessary for lessees to undergo considerable expense in order to develop a market off the premises. This would become necessary whenever no market existed at the well site but an economically feasible market existed off the premises. However, since the lessees expended considerable resources to bring the gas to the market (e. g., by way of a pipeline constructed by lessees, as in the instant case) the gas was more valuable at the market, when it was finally sold, than at the well where it was first produced. In order to recoup these additional expenses, lessees developed the "market value" clause, under which the lessees were obligated to pay as royalty the market value of the gas at the well, which ordinarily was a lesser amount than the market value at the point of the sale.[8]
Language in Davis lease No. 1 (1953) and the Rogers lease (1962) bears out Mr. Bolton's testimony. Davis No. 1 provides for royalties to be:
"on gas ... sold or used off the premises... the market value at the wells of one-eighth (1/8) of the gas so sold or used; provided that on gas sold at the wells, the royalty should be one-eighth (1/8) of the amount realized from such sale...." (Emphasis added).
The Rogers lease provides for royalties on gas to be:
"on gas ... sold or used off the premises... the market value at the well of one-fourth (¼) of the gas so sold or used, provided that on gas sold at the well the royalty shall be one-fourth (¼) of the amount realized from such sale." (Emphasis added).
Thus, if the gas had been sold at the well, plaintiffs claiming as lessors under Davis lease No. 1 and the Rogers lease would clearly be entitled to only 1/8 and ¼, respectively, of the amount realized from the sale, which amounts were established by the 1961 gas sales contract. Since the gas was sold off the premises rather than at the well, however, the lessors under the Davis No. 1 and Rogers leases were entitled, under the terms of the leases, to the market value at the well of 1/8 or ¼ of the gas sold. According to Mr. Bolton's expert analysis, this clause contemplated lessee recoupment of expenses incurred in bringing the gas to market. In fact, the lessees had charged pipeline expenses to the lessors' royalty interests from 1961 to June 21, 1977.[9]
The royalty clauses in Davis lease No. 1 and the Rogers lease are instrumental in *608 determining the parties' common intention. Those clauses provided that royalties from gas sold at the well be based on the amount realized. There is no dispute among the parties that the amount realized could only be determined by the terms of a contract committing the gas to a purchaser, customarily for a long period of time. Thus, in one instance under the leases (i. e., for gas sold at the well) all the parties, lessors and lessees, clearly intended for the lessors' royalties to be tied to the terms of whatever deal the lessees could make when marketing the gas. In light of this clear intent, and after considering the testimony of Mr. Bolton which bears directly upon this issue, we conclude that in the other instance also (i. e., for gas sold off the premises) the parties to the Davis No. 1 and Rogers leases intended for the lessors' royalties to be tied to the gas sales contract, and to be determined by the 1961 market value of natural gas.
If we concluded otherwise by adopting the interpretation placed upon the royalty clauses by the plaintiffs, then the royalties under Davis lease No. 1 and the Rogers lease for gas sold at the well would be entirely dependent upon the amount received under the gas sales contract and would, in fact, have been established in 1961 for the next twenty years, whereas if the gas was sold off the premises, the royalties would not be fixed in 1961 (or whenever the gas might have been sold) but would instead be subject to constant fluctuation based on a theoretical daily market value while the lessees' interest would be fixed by the agreed upon purchase price.
Nothing in the record supports a conclusion that the parties intended for plaintiffs' royalties to be certain and fixed in one instance but subject to change in the other. Since the parties clearly intended for the royalties to be certain and fixed in one instance, we think the only reasonable interpretation of the Davis lease No. 1 and the Rogers lease royalty clauses is that the parties intended for the royalties to be certain and fixed in both instances. The only way this result could be achieved was for the royalties to be based upon the market value for natural gas at the time the gas was committed to the purchaser. The evidence conclusively established that the price paid under the gas sales contact was equal to or better than the prevailing market value in 1961.
The royalty clauses in the Davis No. 2 and No. 3 leases speak only of the "market value of the gas sold or used" without distinguishing, as the Davis No. 1 and Rogers leases did, between gas sold off the premises and gas sold at the well.
Although the language in Davis leases No. 2 and No. 3 less clearly reflects the intention of the parties than the language in the Davis No. 1 and Rogers leases, we do not think the difference in the language was intended to effect the profound changes the plaintiffs hope for. Rather, we believe it is reasonable to infer that the parties intended for the lessors under Davis leases No. 2 and 3[10] to receive the then current market value of the gas whenever it was committed to the purchaser and wherever it was sold, regardless of whether it was sold off the premises or at the well.
It strains the imagination to conclude that the parties intended for the royalties to be at all times uncertain and subject to change, rather than determinable from the terms of the gas sales contract. The effect of holding in plaintiffs' favor would be to force the lessees to pay to the lessors many times more for their fractional royalty interests than the lessees actually received for all the gas. We must conclude that such a result was never contemplated nor intended by the parties.
The plaintiffs introduced no evidence of the parties' intentions. Rather, they relied mainly upon the perceived ambiguity of the term "market value" and the case of Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561 (1934), which adopted Webster's *609 definition of "market price" as "the price actually given in current market dealings." (Emphasis supplied in Wall).
In Wall, the lessee was required to pay the lessor 1/8 of the value of the gas sold off the premises, calculated at the "market price" thereof. The price to be paid was left open or made to depend upon the "market price" at the time the gas was purchased. The lessee settled with the lessors at 4¢ per mcf, contending that this was the market price at the well and was the proper basis for settlement. The lessee admitted selling the gas two miles from the field at 5.8¢ per mcf. The lessors demanded settlement on the basis of the sale price of the gas where sold.
Neither the lease nor the testimony revealed whether the Wall parties intended for "market price" to mean the price at the well or the price the gas would bring in a market remote from the well. In the absence of clear evidence of intent, the Court thought it was reasonable to assume the parties intended for the royalties to be based upon the current market price for gas in the field, 4¢ per mcf, since that is where the gas was reduced to possession and that is where ownership of it sprang into existence. The Wall Court recognized that if it adopted the lessors' position and allowed them to receive 1/8 of the gross price received by the lessee, it would be holding that it was the duty of the lessee to bear all the expenses of carrying the gas to a market beyond the gas field, a result contrary to the Court's holding in Coyle v. Louisiana Gas & Fuel Co., 175 La. 990, 144 So. 737 (1932).
Wall defined "market price" as the price actually given in current market dealings. However, the Court was not concerned with whether the current market price, as opposed to a past market price, was to be used to determine royalty amounts, which is the issue here. Rather, the Court was concerned with whether the parties intended for the market price in the field, as opposed to the market price where the gas was sold, to govern the payment of royalties. Apparently, all parties in Wall agreed that the royalties were to be based upon the current market price at the time the gas was produced. There is no such unanimity of intent here. On the contrary, the parties herein expressly disagree over whether they intended for the royalties to be based upon the 1961 market value or the current market value, and that intent cannot be determined simply by resorting to a half-century old decision which states in dicta that market price means "the price actually given in current market dealings."
We do not believe that the definition the Wall Court placed upon "market price" must be sacredly followed when construing gas leases when, as in the instant case, there is evidence in the record which indicates the parties intended for a past market value, rather than the current market value, to control the computation of royalties. Hence, we find the Wall case distinguishable.
In other respects Wall supports the lessees' contentions rather than those espoused by lessors herein. Being unable to determine the parties' intent after reading the lease and the record, the Court adopted a reasonable interpretation of the parties' intent which was favorable to the lessees. The Court also recognized that the lessee was under no obligation to bear the entire expense of carrying the gas to a market beyond the gas field.
Finally, we consider the argument that the gas could not be sold by the defendants-lessees until it was produced. The defendants countered that the sale was complete, under C.C. Art. 2456, because there existed an agreement for the object and the price, although the object was not yet delivered nor the price paid. As aforementioned the trial court rejected defendants' argument on the principle that natural gas can be neither possessed nor owned until it is delivered into the pipeline, a daily occurrence.
Our decision does not depend upon when each particular unit of gas is sold. From our review of the evidence, we are satisfied that the parties' true intent was for the royalties to be determined by the market value of natural gas at the time the gas was *610 committed to the purchaser in 1961. Since this is what the parties intended, the issue of when the gas is actually or legally sold is unimportant.
For the above and foregoing reasons the judgment of the district court is reversed and the claims of all plaintiffs against all defendants is hereby dismissed. Plaintiffs are cast for all costs.
REVERSED AND RENDERED.
NOTES
[1] Asst. Prof. John M. McCollam anticipated acrimonious litigation of this precise issue in his article "A Primer for the Practice of Mineral Law under the New Louisiana Mineral Code", 50 Tul.L.Rev. 732 (1976), at pages 819-820.
[2] A separate decision is being rendered in Rogers v. Ballard, 401 So.2d 610 (La.App. 3rd Cir. 1981), the companion to this case. However, all issues are common to both cases so they will be discussed only in this opinion.
[3] With regard to a fifth lease, the "Henry Lease", under which William F. Henry, Jr., individually claimed additional royalties as lessor, the trial court held that royalties have been properly paid, because under the royalty provision in that lease the defendants are to account for royalties based on the "sales price," either at the well or at the delivery point; and it is undisputed that royalties have been paid under the Henry Lease on that basis. The dismissal of Henry's claim under this lease has not been appealed so that portion of the judgment will not be disturbed.
[4] According to the trial court's opinion, Ballard & Cordell operated the leases for the lessees pursuant to a Joint Operating Agreement. The plaintiffs-lessors have no dealings with the defendants-lessees except through Ballard & Cordell. The court dismissed all claims in both suits against Ballard & Cordell because it owned no interest in any of the leases. That dismissal has not been appealed.
[5] Frank C. Bolton, Jr. was accepted as an expert in the area of the natural gas production industry as it relates to the area of southwest Louisiana. Robert E. Galbrith, also accepted as an expert, testified as to the market circumstances of natural gas in southwest Louisiana generally and the Calcasieu Pass area particularly.
[6] The field was bordered on the south by the Gulf of Mexico, west by the Lake Charles Ship Channel and the Calcasieu River, and northwest by the Calcasieu River.
[7] See La. R.S. 31:122; Risinger v. Arkansas-Louisiana Gas Co., 198 La. 101, 3 So.2d 289 (1941); Hutchinson v. Atlas Oil Co., 148 La. 540, 87 So. 265 (1921); Lelong v. Richardson, 126 So.2d 819 (La.App. 2nd Cir. 1961), and Waseco Chemical & Supply Co. v. Bayou State Oil Corporation, 371 So.2d 305 (La.App. 2nd Cir. 1979), writ refused 374 So.2d 656 (La. 1979), for judicial recognition of the implied obligation to exercise reasonable diligence in securing a market.
[8] The lessees' right to recoup these additional expenses incurred from marketing the gas off the premises was recognized in Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561 (1934), discussed infra.
[9] After receiving lessors' letter of May 26, 1977, which protested payment of royalties based on proceeds received rather than current market value, the lessees discontinued the practice of charging pipeline expenses and, in fact, voluntarily refunded all charges made from June 1, 1967 to June 21, 1977.
[10] The lessors claiming additional royalties under Davis No. 2 and No. 3 are the same lessors claiming under Davis No. 1.