418 So.2d 1334 (1982)
W. F. HENRY, Jr., et al.
v.
The BALLARD & CORDELL CORPORATION, et al.
Milford A. ROGERS
v.
Wiley P. BALLARD, Jr., et al.
No. 81-C-2364.
Supreme Court of Louisiana.
July 2, 1982.
Rehearing Denied September 24, 1982.
Jerry G. Jones, Jones, Jones & Alexander, Cameron, J. Michael Veron, Scofield, Bergstedt, Gerard, Hackett & Mount, Lake Charles, for plaintiffs-applicants.
Gene W. Lafitte, John M. Wilson, Lawrence P. Simon, Jr., and Joe B. Norman, Liskow & Lewis, for defendants-respondents. Campbell C. Hutchinson, Anthony M. DiLeo and Jo Harriet Strickler, Stone, Pigman, Walter, Wittman & Hutchinson, New Orleans, William J. Guste, Jr., Atty. Gen., Ernest R. Eldred, Asst. Atty. Gen., Law Offices, Ernest R. Eldred, Baton Rouge, William C. Broadhurst, Broadhurst, Brook, Manghan, Hardy & Reed, Lafayette, Oliver P. Stockwell, Bernard H. McLaughlin, Jr., Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, William J. Conrad, Frederick W. Veters, John M. McCollam, Andrew L. Gates, III, Gordon, Arata, McCollam & Stuart, New Orleans, Robert C. Smith, Karen Katz, Lake Charles, Arthur C. Watson, Watson, Murchison, Crews, Arthur & Cockern, Natchitoches, H. H. Hillyer, Jr., John C. Christian, Kennedy J. Gilly, Jr., Melanie Miller, Milling, Benson, Woodard, Hillyer, Pierson & Miller, New Orleans, C. Murphy Moss, Jr., Loretto M. Babst, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for amici curiae.
*1335 BLANCHE, Justice.
Plaintiff landowners seek to recover outstanding royalty payments allegedly due under several gas leases executed between plaintiffs as lessors and defendants as lessees. Where gas is produced and then sold off the leased premises, the leases provide for royalty payments to the lessors equal to a percentage or fraction of the market value of the gas sold. Definition of the term "market value" in the context of these gas leases is at the heart of this dispute. Defendants have paid royalties based upon the price received from an interstate purchaser pursuant to a long term sales contract executed in 1961. In essence, defendants maintain that the 1961 contract price is equal to the market value of the gas under the royalty provisions of the gas leases. Plaintiffs assert that royalties are to be calculated on the basis of the current market value of the gas, a value greatly in excess of the 1961 contract price.
The issue presented by this litigation was set out by the court of appeal:
Is the amount due the lessors as royalty under these leases to be based upon the prevailing market value at the time the gas was committed to the purchaser by the lessees under a long term gas sales contract, or is the royalty to be based instead upon the current market value determined on a daily basis the moment the gas is produced and/or delivered to the purchaser? Henry v. Ballard & Cordell, 401 So.2d 600 (3rd Cir. 1981), at p. 602.
As noted by the appellate court, this issue is res nova in Louisiana, although it has been the subject of considerable litigation in other jurisdictions.[1] The magnitude of interests affected by its resolution in Louisiana mandated our decision to grant writs in these consolidated cases.
The leases at issue affect property in the Cameron Pass Field in Calcasieu Parish. The royalty provisions of the respective leases read as follows:
Davis Lease No. 1, dated March 19, 1953:
Royalty Provision:
On gas, including casinghead gas or other gaseous substance and liquid hydrocarbon content thereof, produced from said land and sold or used off the premises, or for the extraction of gasoline or other products therefrom, the market value at the wells of one-eighth of the gas so sold or used; provided that on gas sold at the wells, the royalties shall be one-eighth of the amount realized from such sale; ...
Davis Lease No. 2, dated December 10, 1960:
Royalty Provision:
One-sixth (1/6) of the market value of the gas sold or used by Lessee in operations not connected with the land leased or any pooled unit containing a portion of said land; ...
Davis Lease No. 3, dated June 22, 1964: Royalty Provision:
18.5% of the market value of the gas sold or used by Lessee in operations not connected with the land leased or any pooled unit containing a portion of said land;
...
Rogers Lease, dated September 7, 1962:
Royalty Provision:
On gas, including casinghead gas or other gaseous substance produced from said land and sold or used off of the premises, or used in the extraction of gasoline or other product therefrom by Lessee, the market value at the well of one-fourth (¼) of the gas sold or used, provided that on gas sold at the well the royalties shall be one-fourth (¼) of the amount realized from such sale; ...
The leases were found to be productive of natural gas in 1961. Pursuant to its contractual obligation to diligently market the *1336 production,[2] Ballard & Cordell executed a sale of the gas to American Louisiana (now Michigan Wisconsin) Pipeline Company, an interstate purchaser of natural gas and the only available market for gas from the Cameron Pass Field in 1961.
Evidence at trial conclusively established that negotiations between Ballard & Cordell and American Louisiana were conducted in good faith and at arm's length and that the resulting sales contract was quite favorable from the standpoint of both defendants and plaintiffs-lessors. The price obtained in the sale was equal to or better than prices in comparable sales made at that time. The price escalation clause, which provided for price increases over the term of the contract, was among the best contained in any such sale. The sales contract extended for a term of 20 years, a customary term for such contracts in the natural gas industry in 1961. Long term sales contracts (extending for as long as the life of the lease) were universally insisted upon by pipeline purchasers to enable them to obtain requisite financing for the construction of capital intensive pipeline facilities.[3]
Beginning with the first deliveries of gas to American Louisiana, defendants have made royalty payments to the plaintiffs landowners based on the proceeds actually received for the sale of gas production from the leases under the 1961 sales contract. In 1976, the sales contract price first became out of line with the current market value of natural gas. In 1978, as the disparity between the 1961 sale contract price and prices paid by purchasers in more recent contracts continued to increase, plaintiffs filed this suit for outstanding royalties, contending the leases provide that royalty payments must be calculated on the basis of the current market value of the natural gas.
Plaintiffs' argument relies heavily on the 1934 case of Wall v. Public Gas Service Co., 178 La. 908, 152 So. 561 (1934). In Wall, this Court was required to interpret a mineral lease royalty clause which provided for royalties based upon "the value of such gas calculated at the market price". The controversy in Wall centered on whether the royalties were to be calculated on the basis of the market price in the field, or the market price where the gas was sold (a point two miles from the field). In dicta, however, the Wall court adopted Webster's definition of market price as "the price actually given in current market dealings." (Emphasis supplied in Wall).
The trial court held that the market value provisions of the royalty clauses at issue require that royalties be paid on the basis of current sales, including sales made in the higher-priced intrastate market, which remained unregulated until 1978. Accordingly, the court ordered defendants to account *1337 to plaintiffs from September 1976 through the date of judgment for the difference between proceeds actually received under the 1961 sales contract and the current market value of the gas attributable to the fractional share of plaintiffs.
In its opinion, the trial court adopted the following definition of market value:
"... the market value of a thing is the price which it might be expected to bring if offered for sale in the market."
On appeal, the Third Circuit reversed the trial court judgment. Acknowledging that the market value of a thing is the price which it might be expected to bring if offered for sale in the market, the court of appeal did not agree with the conclusion of the trial court that the term "market value", standing alone, clearly means current market value. Instead, the court of appeal found that the parties to these lease contracts "intended for the royalties to be governed by the market value of the natural gas which prevailed in 1961 when the gas was committed to the purchaser under the gas sales contract rather than by the current market value, to be determined on a daily basis as gas is produced and or delivered to the purchaser." 401 So.2d 600, at p. 604.
For the reasons hereinafter assigned, we affirm the decision of the court of appeal.
The ambiguity in the language of the royalty provisions arises from the failure of the parties to the lease to expressly state whether "market value" means current market value. We note that the same or similar contract language has often been interpreted by the courts of other jurisdictions, and that these cases may be clearly divided according to two distinct lines of legal reasoning.
Although the majority of jurisdictions have interpreted the ambiguity in the royalty provisions against the lessee,[4] they have done so by ignoring the practical realities of the oil and gas industry, and the obligations of the lessee to market the gas at the best possible price at the time the leases were made. These cases hold that the lessee is obligated to pay royalties based upon the current market value of the natural gas, and that this royalty obligation is unaffected by the contracts executed by the lessee for the sale of the gas.
The majority position has been most notably set forth by the Texas Supreme Court in Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866 (Tex.1968).[5] The mineral lease at issue in Vela provided for royalty payments on gas sold or used off the premises of "1/8 of the market price at the wells." In 1935, two years after execution of the lease, the lessees committed the gas to certain "life-of-the-lease" sales agreements. At the time suit was filed, prices received by others under more recent sales contracts covering gas produced by the same field far exceeded the proceeds generated under the 1935 agreement. The royalty owners contended that the term "market price" as used in the royalty provisions of the mineral lease referred to current prices in the area, rather than the price received under the 1935 sales contract. The Texas Supreme Court agreed.
Noting that none of the royalty owners had ever agreed to accept royalties on the basis of the price stipulated in the gas sale agreements, the Texas Supreme Court held that, regardless of the economic realities inherent in the marketing of natural gas,[6] the royalties to which the owners were entitled "must be determined from the provisions of the oil and gas lease, which was executed prior to and is wholly independent *1338 of the gas sales contracts." Texas Oil & Gas Corp., supra, at p. 870.
In another portion of its royalty clause, the Vela lease provided for calculation of royalties on casinghead gas on the basis of actual proceeds received from the sale of that type of gas. Citing this language, the Vela court concluded that the parties knew how to provide for royalties payable on some basis other than market value and could easily have done so in the case of gas well gas. Instead, the parties to the lease "stipulated in plain terms that the lessee would pay 1/8 of the market price at the well of all gas sold or used off the premises. This clearly means the prevailing market price at the time of use or sale. The gas which was marketed under the long-term contracts in this case was not `being sold' at the time the contracts were made but at the time of the delivery to the purchaser, [citation omitted]. We agree with the Court of Civil Appeals, therefore, that the contract price for which the gas was sold by the lessee is not necessarily the market price within the meaning of the lease." Texas Oil & Gas Corp., supra, at p. 871.[7]
The practical and economic necessities of the oil and gas industry at the time the leases were negotiated are given little or no consideration in the line of cases represented by Vela. Because such factors necessarily would have bearing upon the intent of the parties concerning payment of royalties, the result reached in those cases has been greatly criticized.[8] Among those factors demanding consideration are the following:
(1) Where the mineral lease provides for payment to the lessor of a fractional royalty interest, the lease arrangement is in the nature of a cooperative venture: the lessor contributes the land and the lessee the capital and expertise necessary to develop the minerals for the mutual benefit of both parties. "From this arises the affirmative, although implied obligation of the lessee to market or dispose of the product in a reasonable and prudent way to secure the maximum benefit possible for both parties."[9]
(2) The ultimate objective of the royalty provisions of a lease is to fix the division between the lessor and lessee of the economic benefits anticipated from the development of the minerals. In the case of oil, a truly fungible product, the lessor is usually given a fractional part of the production, with authority to take or dispose of it as he desires. "Most leases recognize such an arrangement is neither practicable nor realistic for gas. Consequently, they usually contemplate that the lessee will dispose of the gas (in a prudent manner) and pay the lessor the fractional part of the value which he is to enjoy from the enterprise."[10]
(3) "When most leases currently in production were executed, and certainly until *1339 quite recently, it was neither practical nor would it have been prudent for a lessee to refuse to sell the gas under a long-term contract. Such prices were generally higher than the so-called spot or short-term price."[11]
The Oklahoma Supreme Court in its recent opinion in Tara Petroleum Company v. Hughey, 630 P.2d 1269 (Ok. 1981) took full cognizance of these and other factors in holding:
... When a producer's lease calls for royalty on gas based on the market price at the well and the producer enters into an arm's-length, good faith gas purchase contract with the best price and term available to the producer at the time, that price is the "market price" and will discharge the producer's gas royalty obligation. Supra, at p. 1273.
Representative of the minority position on this issue, the Tara court emphasized the duty under which the lessee operates to diligently market gas produced under a lease, and that this duty usually requires the lessee to enter long-term contracts for the sale of the gas.
We have recognized this necessity of the market, and we believe that lessors and lessees know and consider it when they negotiate oil and gas leases. Lessors and lessees also know that during the term of a gas purchase contract gas prices may increase, perhaps substantially. During the term a producer's revenues, fluctuations in production aside, will not increase. Yet if royalty must be paid on the basis of a "current," steadily-increasing "prevailing" price, then the lessor's share will take an ever larger and larger proportion of the producer's revenues.
* * * * * *
We believe that our interpretation of "market price" is consonant with the intent and understanding of parties to oil and gas leases. And it is the only interpretation that would operate fairly for producers. Moreover, it is not unfair to lessors. Quite naturally, lessors want to receive as much royalty as possible, but lessees in their own interest seek as good a price as they can get for gas. As long as the contract was reasonable when entered into, and as long as our law recognizes long-term gas purchase contracts as binding in the face of escalating prices, the law should not penalize the producer who was forced into the contract in large measure by his duty to the lessor. Now if the contract was not reasonable when entered into, if it is not at a minimum fair and representative of other contracts negotiated at the time in the field, then a different result obtains. Then the lessee has not protected his lessor in discharging his duty to market the gas, and there is no policy in the law requiring the courts to protect the lessee in interpreting the lease. Supra at pp. 1273 and 1274.
Like the Oklahoma court in Tara, we believe that ambiguity in royalty provisions such as those at issue in this litigation cannot be resolved without consideration of the necessary realities of the oil and gas industry. Strong support is found for this minority position in the articles of our civil code applicable to the interpretation of contracts. See C.C. arts. 1945, et seq. and C.C. arts. 1964, 1966.
Article 1950 of the Civil Code directs us to endeavor to ascertain the common intention of the parties to the contract, where there is anything doubtful in their agreement. In ascertaining this intention (where it cannot be adequately discerned from the contract or agreement as a whole) the circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry. Cooley v. Meridian Lumber Co., 195 La. 631, 197 So.2d 255, 258 (1940).[12] In the instant cases, the known *1340 obligation of the lessee to market discovered gas reserves, and the accepted universal practice of marketing such reserves under long-term gas sales contracts provide the background against which these leases were executed.
The custom of the industry may also be considered in determining the true intent of the parties as to ambiguous contract provisions. C.C. arts. 1964,[13]a 1966;[14]Fee v. Vancouver Plywood Co., Inc., 331 So.2d 151 (La.App. 3rd Cir. 1976), writ den. 334 So.2d 434 (1976). At trial, defendants presented unrefuted evidence that customary practice in the oil and gas industry required the lessee to pay "market value" royalties on gas in dollar amounts equivalent to the price received under a long-term sales contract (less permissible transportation charges), and the lessors to accept royalty payments so calculated.
Applying the pertinent rules of contract interpretation to the evidence presented in these cases, we find the parties to the mineral leases at issue intended that royalties based on the "market value" of the gas be computed on the basis of the price received for the gas under the 1961 sales contract.
We emphasize that plaintiffs-lessors have never contended in these cases that the 1961 gas sales contract was not made in good faith, or was unreasonable in any respect, whether as to price, contract term or otherwise. On the contrary, when the gas was discovered in 1961, because of the geographical isolation of the Calcasieu Pass Field, there was but one economically feasible market for the gasthe interstate pipeline of American Louisiana. American Louisiana would only agree to purchase the gas under a 20-year sales contract. Uncontradicted evidence at trial established that the price obtained by defendants in the 1961 sale was equal to or better than prices obtained in similar sales in the relevant market area at that time.
As noted by the court of appeal:
The effect of holding in plaintiffs' favor would be to force the lessees to pay to the lessors many times more for their fractional royalty interests than the lessees actually received for all the gas. 401 So.2d at 608.
We do not propose to penalize defendants' good faith compliance with their lease obligations by requiring them to pay royalties based on a current, fluctuating, day-to-day market value of gas several times higher than the price received by them in a sales contract admittedly in the best interest of both lessors and lessees. Had plaintiffs shown that the purpose of the market value royalty clause was to provide them with protection as to price, regardless of what disposition is made of the gas by lessee and regardless of what price was received, then we would arrive at a different conclusion.
But plaintiffs have given us little help, except to claim that we have departed from our long-standing position in Wall, supra. As noted by the court of appeal, the Wall court was not concerned with whether the current market price, as opposed to a past market price was to be used in determining royalty amounts. Apparently, all parties in Wall agreed that the royalties were to be based upon the current market price at the time the gas was produced. None of the parties in Wall introduced evidence of a contrary intent.
In the instant case, only defendants have presented evidence of the intent of the parties to the mineral lease. All of this evidence *1341 indicates that the parties intended for a past, rather than a current, market value to control computation of royalties. As did the court of appeal, we find the Wall case clearly distinguishable on this basis.
Therefore, considering all of the circumstances set forth hereinabove which surrounded the parties at the time of contracting, the known obligation of the lessee to market discovered gas reserves, and the accepted, universal practice of marketing such reserves under long-term gas sales contracts, "market value" in the context of these leases could only mean the "market value of the gas when it was marketed under the 20 year gas sales contract.
For the foregoing reasons, the decision of the court of appeal is affirmed.
AFFIRMED.
CALOGERO, J., assigns additional concurring reasons.
DENNIS and WATSON, JJ., dissent and assign reasons.
LEMMON, J., dissents and will assign reasons.
CALOGERO, Justice, assigning additional concurring reasons.
I subscribe to the majority opinion and am also in accord with the Court of Appeal opinion in this case. I submit these additional comments to accent what I appreciate to be the holding of the majority.
As I understand the majority opinion, it does not determine that for all parties to a mineral lease containing the term "market value" that that term will be interpreted as meaning the price in the gas sales contract. To the contrary, the determinations made in the majority opinion are expressly limited to the cases under consideration. The Court held:
Applying the pertinent rules of contract interpretation to the evidence presented in these cases, we find the parties to the mineral leases at issue intended that royalties based on the "market value" of the gas be computed on the basis of the price received for the gas under the 1961 sales contract.
* * * * * *
Had plaintiffs shown that the purpose of the market value royalty clause was to provide them with protection as to price, regardless of what disposition is made of the gas by lessee and regardless of what price was received, then we would arrive at a different conclusion.
* * * * * *
In the instant case, only defendants have presented evidence of the intent of the parties to the mineral lease. All of this evidence indicates that the parties intended for a past, rather than a current, market value to control computation of royalties.
Thus it is clear that the majority relied on its understanding of the intent of the parties in entering into the lease agreement in determining what was meant by "market value" as used in the leases under consideration. The record in this case clearly supports that determination. Plaintiffs presented no evidence of their intentions in entering into these agreements, but relied solely on their argued interpretation of the contractual language. The defendants presented unrefuted expert testimony of the prevailing view in the industry that "market value" as used in gas leases at that time did not mean current market value. One of the experts was of the view that he did not believe that any lessee would knowingly enter into a lease with a royalty provision that obligated him to pay royalties based on a day to day market value. Therefore, the majority is determining nothing more today than that, as between these parties, the lessee satisfies his obligation under their contract to pay royalties to the lessor based on "market value" when he pays those royalties based on the price he is receiving under a gas sales contract where the lessee entered into an arm's length, good faith gas purchase contract with the best price and term available to the lessee at the time he entered it.
Furthermore, contrary to the views expressed by my dissenting brothers, there is *1342 no evidence in this record to support the conclusion that the leases were not "negotiated", or that the lessees prepared, initiated or proposed the agreements. All but two of the leases involved in this litigation are standard Bath form leases, in use generally throughout the Calcasieu area at that time. There is no evidence at all concerning preparation of the other two leases. Notwithstanding the fact that the record does not establish that the lessees prepared these leases, the dissenting Justices seem to be of the view that as a general proposition, mineral leases are to be construed against the lessees. While that may be the prevailing view in Kansas, this Court disapproved of such a per se rule in Hunt Trust v. Crowell, 210 La. 945, 28 So.2d 669 (1946).
Consternation is expressed by the dissenters over the "evidentiary burden" which is placed on all lessors by the majority opinion. I find it difficult if not impossible to conclude that such an arduous evidentiary burden is created by this case. The simple facts here are that the lessors have not even contended that, at the time they entered into the leases, they thought "market value" meant or intended to mean current market value, day to day (or for that matter, month to month, or year to year), rather than the market value at the time the gas was committed in the gas sales contracts.
DENNIS, Justice, dissenting.
I respectfully dissent.
The majority's decision is not based upon existing rules of law and the evidence in this case. It is judicial lawmaking in a broad form, and it adopts a rule which will affect virtually every lease under which gas is produced.
The majority has fallen into error in this very important mineral rights case in the following respects: (1) The lease provisions at issue are not ambiguous. (2) As ably demonstrated by Justice Watson in his dissenting opinion, and by several of the briefs filed herein, even if the lease provisions were ambiguous, Louisiana law requires that the contracts be construed against the producer-lessees who initiated and proposed the agreements. (3) Even if the lease provisions were ambiguous, and even if Louisiana law did not require that the contracts be construed against the lessees the evidence in the record still does not support a finding that the landowners knowingly entered a "cooperative venture" under which their royalties would be tied to either the lessors' resale price or the 1961 market values for the life of the leases.[1] (4) Indeed, the majority does not attempt to determine the intention of the parties to the contracts from the evidence in this case. Instead, citing an Oklahoma Supreme Court opinion as its authority, the majority judicially decrees that all oil and gas leases in Louisiana are essentially joint ventures and that every lessor is entitled only to share in the proceeds of the producer's good faith sales to third parties, regardless of whether the sales are at market value or otherwise. The majority thus creates a presumption that every mineral lessor intends to be bound by the price obtained for gas by his lessee. Furthermore, the opinion of the court provides that a lessor-landowner must prove fraud in order to rebut the presumption.
In my opinion the lease provisions are not ambiguous. In Louisiana and other states "market value" means what a willing buyer would pay a willing seller in a free and open market.[2] It does not mean "resale *1343 price" or "market value at the time of commitment to long term contract." When each lease was contracted, if the parties had intended that royalties would be based on the producer's resale price, or on a market value frozen on a certain date, they would have said so. I believe that a reasonable lessor in 1961 would have thought that the lessee's promise to pay royalty based simply on market value obligates him to pay market value for gas when it is produced and reduced to possession. The lessee cannot transfer title to the gas prior to this time because he does not obtain title until the minerals are under his physical control. La. R.S. 31:7 and Comment. Only an objective current market value standard affords the landowner any real protection against inflation, fraud or collusion.
Although I do not find the lease provisions ambiguous, I agree with Justice Watson that in the event of any doubt the contracts must be construed in favor of the lessor-landowner. In addition to the authorities he cites, the following should be noted: (1) If the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, the construction most favorable to the other party shall be adopted. La. C.C. art. 1958. The lessee was clearly in a better position to clarify any ambiguity in the royalty provisions of the leases. The lessee, not the lessor, contemplated entering into a long term agreement to supply gas to a third party at a fixed rate after promising the lessor to pay royalties at market value. The lessee, therefore, ought to have given the lessor an explanation that because of his proposed agreement with third parties he could not and did not intend to pay royalty at fair market value but at a percentage of his resale price. (2) Where a layman contracts with a knowledgeable and experienced businessman, the burden is on the latter to point out obscurity in the contract. Larriviere v. Roy Young Inc., 333 So.2d 254 (La. App. 3d Cir. 1976); see Leithman v. Dolphin Swimming Pool Co., 252 So.2d 557 (La. App. 4th Cir. 1971). (3) A contract should not be so construed as to render important expressions meaningless. La. C.C. art. 1951; Glassell v. Richardson Oil Co., 91 So. 431,150 La. 999 (1922); Crow v. Southern Natural Gas Co., 210 So.2d 596 (La. App. 2d Cir. 1968); Jacob Fallo, Inc. v. Durr, 4 La.App. 155 (Orleans 1926); Bahns v. Ernest A. Carrere Co., 13 Orl.App. 290 (1916).
Ultimately, however, the most harmful aspect of the majority opinion overshadows its mishandling of the ambiguity issues. If my brethren merely had found a clear contract ambiguous and resolved the doubt against the wrong party, their holding would be restricted to this case and others dealing with similar lease provisions. Instead, they have announced a broad new rule of law which provides that an oil and gas lease is a "cooperative venture" and that the producer cannot be required to pay royalty at a higher rate than he sells the gas for, unless the landowner can prove fraud or unless, perhaps, the landowner-lessor can by parol evidence prove the parties specifically discussed and understood that the market value royalty clause was to provide the lessor with protection as to price. The practical effect of this rule of law is to strip landowner-lessors of any protection *1344 under virtually all market value royalty clauses and to require that their compensation for minerals produced from their lands shall be governed exclusively by dealings between the lessees and other parties. I know that my brethren do not think this rule will work an injustice in this case, but the precept they announce today will apply to a diversity of situations in which landowners may be unable to rectify real injustice because of the evidentiary burden it places upon them.
WATSON, Justice, dissenting.
The majority's opinion is both legally unsound and patently unfair.
The evidence was that these leases were not negotiated. An offer was made to the landowners on the terms and conditions set out in the printed contracts. The landowners' only choice was acceptance or rejection. After admitting that the royalty provisions are ambiguous, the majority construes the language against the landowners, who had no voice in drafting the terms. The trial court correctly construed these contracts against the lessees who supplied them. Mallett v. Union Oil & Gas Corp., 232 La. 157, 94 So.2d 16 (1957). Gas leases are generally strictly construed against the lessee producer. Lightcap v. Mobil Oil Corp., 221 Kan. 448, 562 P.2d 1 (1977).
The record and the jurisprudence offer scant support for the majority's contention that the "custom of the industry" shows market value to be the value of the gas at the time a sales contract is confected. The trial court refused to accept the "self-serving position of the industry" on this point. (Tr. 180)
Most jurisdictions define market value on a current basis. Foster v. Atlantic Refining Company, 329 F.2d 485 (1964); Texas Oil & Gas Corporation v. Vela, 429 S.W.2d 866 (1968); Lightcap v. Mobil Oil Corp., supra; Exxon Corp. v. Middleton, 613 S.W.2d 240 (Tex., 1981). In the past, so has Louisiana. Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561 (1934). Also see F.E. R.C. v. Pennzoil Producing Co., 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979).
In adopting a minority interpretation of these leases, the majority acts to the detriment of the State of Louisiana and its residents as well as these particular plaintiffs.
I respectfully dissent.
NOTES
[1] See e.g. Foster v. Atlantic Refining Company, 329 F.2d 485 (5th Cir. 1964); Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866 (Tex. 1968); Lightcap v. Mobil Oil Corp., 221 Kan. 448, 562 P.2d 1 (1977), cert. den. 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977), motion for rehearing denied, 440 U.S. 931, 99 S.Ct. 1272, 59 L.Ed.2d 489 (1979); Tara Petroleum Corp. v. Hughey, 630 P.2d 1269 (Okla. 1981).
[2] The implied covenants which burden the lessee's interest include, among others, the covenant to protect the lease from being drained of hydrocarbons, the covenant to reasonably develop the leased premises, the covenant to market production obtained from the leased premises with dispatch, the covenant to use reasonable care in operations conducted on the lease, and when appropriate, the covenant to seek favorable administrative action to aid the discharge of the lessee's duties under the lease. See R.S. 31:122.
[3] "Unlike liquid hydrocarbons, gas cannot be stored in surface containers, nor can it be transported by truck. Rather, gas normally is marketable only when the reserves in the field where the lease is situated justify the sizeable capital expenditure necessary to construct and lay a pipeline capable of transporting the gas to its market destination.

Pipeline systems, of course, are complex creatures and are quite expensive to construct. Investors traditionally have not been willing to build pipelines unless gas is available in a sufficient quantity and has been committed to the pipeline for an adequately long period, thereby providing the investors with reasonable assurance that they will make a profit on their investment. Thus, the justification for the capital expenditure necessary to construct the pipeline usually comes in the form of long-term gas sale contracts which effectively commit the volume of gas to be sold to the purchaser who will transport the gas through its pipeline to the point of consumption.
Holliman, Exxon Corp. v. Middleton: Some Answers but Additional Confusion in the Volatile Area of Market Value Gas Royalty Litigation, 13 St. Mary's L.J. 1 (1981).
[4] See, e.g. Texas Oil Lightcap Mobil Oil Corp. v. Vela, supra; Exxon Corp. v. Middleton, 613 S.W.2d 240 (Tex. 1981).
[5] The Texas Supreme Court recently affirmed its Vela doctrine in Exxon Corp. v. Middleton, supra.
[6] As in the instant case, the lessees in Vela presented evidence there was only one available market for the gas at the time of its discovery; the gas could only be sold pursuant to a life-of-the-lease sales agreement. The trial court found that the sales agreements were entered into in good faith and that finding was not attacked on appeal.
[7] The Texas Supreme Court in Vela relied heavily upon the decision by the 5th Circuit Court of Appeal in Foster v. Atlantic Refining Company. Analysis of the 5th Circuit's opinion in Foster indicates that reliance is misplaced. In Foster, the court was required to interpret an atypical royalty clause calling for market price when the gas is run. The Foster court emphasized that the clause expressly provided for the payment of royalty based upon the market price prevailing in the field where the gas was produced at the time of delivery. Such an express provision is conspicuously absent in the type of royalty clauses interpreted by the Courts in Vela and its progeny.
[8] See Harrell, Developments in Non Regulatory Oil & Gas Law, The 30th Annual Institute on Oil & Gas Law & Taxation, Southwestern Legal Foundation, 311 (1979); Summers, The Law of Oil & Gas, Sec. 589, p. 12, et seq. (1981 Supp.); Holliman, Exxon Corp. v. Middleton: Some Answers but Additional Confusion in the Volatile Area of Market Value Gas Royalty Litigation, 13 St. Mary's L.J. 1 (1981); Fischer, Ascertaining the Value or Price of Gas for Purposes of the Royalty Clause, 21 Okl.L.Rev. 22 (1968).
[9] Harrell, Developments in Non Regulatory Oil & Gas Law, supra.
[10] Id. at p. 335. Indeed, professor Harrell contends that:

... any determination of the market value of gas which admits the lessee's arrangements to market were prudently arrived at consistent with the lessee's obligation, but which at the same time permits either the lessor or lessee to receive a part of the gross revenues from the property greater than the factional division contemplated by the lease, should be considered inherently contrary to the basic nature of the lease and be sustained only in the clearest of cases. At p. 336.
[11] Id. at p. 335.
[12] Andrews Coal Co. v. Bd. of Directors of Public Schools, Parish of Orleans, 151 La. 695, 92 So. 303, 304 (1922). In interpreting a contract "it should be construed in the light of the circumstances surrounding [the parties] at the time it is made, it being the duty of the court to place itself as nearly as may be in the same situation of the parties at the time, so as to view the circumstances as they viewed them, and so to judge the meaning of the words and the correct application of the language of the contract. [Quoting from 13 Corpus Juris, p. 525]. See also Arts. 1945, 1950, 1951, 1955 and 1956.
[13] Art. 1964. Incidents Supplied by law, equity or usage. Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources.
[14] Art. 1966. Usage as part of contract. By the word usage mentioned in the preceding articles, is meant that which is generally practiced in affairs of the same nature with that which forms the subject of the contract...
[1] It is unclear from the majority opinion whether the lessor-landowner is bound by the lessee's resale price or by the market value at the time the lessee commits himself to a longterm gas purchase contract with a third party.
[2] Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103 (1937); Harman v. Defatta, 182 La. 463, 162 So. 44 (1935); Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561 (1934); State, Through Dept. of Highways v. Gifford Hill & Co., 158 So.2d 448 (La. App. 2d Cir. 1963); Orleans Parish School Board v. Brown, 154 So.2d 545 (La. App. 4th Cir. 1963); State, Through Dept. of Highways v. Rapier, 152 So.2d 448, 449 (La. App. 2d Cir. 1963); United States v. Certain Property in Borough of Manhattan, 403 F.2d 800 (2d Cir. 1968); Exxon Corp. v. Middleton, 613 S.W.2d 240 (Tex. 1981); Matter of Estate of Romnes, 398 A.2d 543, 79 N.J. 139 (1979); State Dept. of Highways v. Schumaker, 590 P.2d 1110 (Mont. 1978); Morrison's Estate v. Idaho State Tax Commission, 572 P.2d 869, 98 Idaho 766 (1977); Massey v. Tube Art Display, Inc., 551 P.2d 1387, "15 Wash.App. 782 (1976); In re Voss's Estate, 303 N.E.2d 9, 55 Ill.2d 313 (1973); Davis v. State Dept. of Public Health and Welfare, 483 S.W.2d 775 (Mo. 1972); Tome Land & Imp. Co. v. Silva, 494 P.2d 962, 83 N.M. 549 (1972); Valley Forge Golf Club, Inc. v. Board of Assessment and Revision of Taxes of Montgomery County, 285 A.2d 213, 3 Pa. Comwlth. 644 (1971); 0.744 of An Acre of Land, City of Wilmington v. State ex rel. State Highway Dept., 251 A.2d 341 (Del. 1969); Whitworth v. State Highway Commission, 161 S.E.2d 698, 209 Va. 95 (1968); Appropriation for Highway Purposes of Lands of Landsford, 239 N.E.2d 110, 113, 15 Ohio App.2d 131 (1968); Rau v. Fritz, 134 N.W.2d 773, 81 S.D. 311 (1965); Bond v. State, 263 N.Y.S.2d 732, 24 A.D.2d 778 (1965); Arkansas State Highway Commission v. Stanley, 375 S.W.2d 229, 237 Ark. 664 (1964); Shirley v. Menit, 364 P.2d 192, 147 Colo. 301 (1961); Popwell v. Shelby County, 130 So.2d 170, 272 Ala. 287 (1961); State Roads Commissioner v. Warriner, 128 A.2d 248, 211 Md. 480 (1957).